831 So.2d 21 (2002)
Sue RYAN and Willard Ryan
v.
Jim HAYES et al.
Karl Franklin Smith, individually and as next friend of William Frank Smith III, a minor
v.
Jim Hayes et al.
Michael Peden and Harold Peden
v.
Jim Hayes et al.
1001578, 1001630 and 1001631.
Supreme Court of Alabama.
March 22, 2002.
*22 Randall S. Haynes and Larry W. Morris of Morris, Haynes & Hornsby, Alexander City, for appellants Sue Ryan and Willard Ryan.
Nat Bryan and Thomas M. Powell of Marsh, Rickard & Bryan, P.C., Birmingham, for appellants Karl Franklin Smith, Michael Peden, and Harold Peden.
Winston V. Legge, Jr., of Patton, Latham, Legge & Cole, Athens, for appellee Jim Hayes.
Andrew W. Redd, asst. atty. gen., and general counsel; and William F. Addison, asst. atty. gen., and asst. general counsel, Department of Corrections, for appellees Ralph Hooks and David Wise.
*23 Barnes F. Lovelace, Jr., of Harris, Caddell & Shanks, P.C., Decatur, for appellee Jim Yarbrough.
John Percy Oliver II of Oliver & Sims, Dadeville, for amici curiae Alabama Coalition Against Rape (ACAR) and Victims of Crime and Leniency (VOCAL).
HARWOOD, Justice.
The three above-captioned cases, consolidated on appeal, were brought in the Circuit Court of Limestone County by the victims of a post-escape rampage by Scourterrious Lofton ("Lofton"), an inmate at the Limestone Correctional Facility ("Limestone"), located in Capshaw, who, along with another inmate, escaped from a disciplinary chain gang on June 25, 1997. The defendants in these actions were Jim Hayes, the classification-specialist supervisor at Limestone; Ralph Hooks, the warden of Limestone; David Wise, the deputy warden; and Jim Yarbrough, a correctional officer at Limestone. For purposes of this appeal, we are assuming the following facts to be undisputed.
After he escaped, Lofton stole a truck and drove to Tennessee where he encountered Karl Franklin Smith and his minor son William Franklin Smith III ("the Smiths") at a fireworks store; he robbed and assaulted the father and assaulted the son. Michael Peden and Harold Peden ("the Pedens") were also at the fireworks store, and Lofton assaulted Michael and stole a truck belonging to Harold. Later that same day, Lofton broke into the residence of Willard Ryan and Sue Ryan ("the Ryans") in Georgia and terrorized them by repeatedly raping Mrs. Ryan and beating Mr. Ryan. Lofton was eventually captured at the Ryans' residence.
The action subsequently instituted by the Ryans in the Circuit Court of Limestone County, as last amended, charged the defendants with various acts and omissions constituting negligence or wantonness. Shortly after the Ryans filed their action, the Smiths and the Pedens, represented by the same counsel, filed their respective actions. As last amended, those actions involved the same defendants, and the complaints charged them with essentially the same negligent or wanton acts and omissions. The Ryans, on one hand, and the Smiths and the Pedens, on the other, are represented by different counsel.
All of the defendants were sued only in their individual capacities. In addition to charging the defendants with negligent or wanton acts or omissions, the complaints in each case additionally charged that the defendants had acted fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law. No charges of intentional tortious conduct were made against any of the defendants. In each of the three actions, the warden and the deputy warden were represented by the attorney general, and Hayes and Yarbrough were represented by their respective separate counsel. Extensive discovery was conducted in the cases. Eventually the defendants filed motions for a summary judgment, each making the argument (1) that he was entitled to State-agent immunity under the rule articulated in Ex parte Cranman, 792 So.2d 392 (Ala. 2000), and (2) that this Court's holding in Donahoo v. State, 479 So.2d 1188 (Ala. 1985), established that none of the defendants had a duty to protect any of the plaintiffs from Lofton. The plaintiffs' responses in opposition to those summary-judgment motions addressed the defendants' arguments based on Cranman and Donahoo. Accordingly, no argument was presented to the trial court concerning the plaintiffs' allegations that the defendants' actions were fraudulent, in bad faith, beyond their authority, or committed under a *24 mistaken interpretation of the law. On April 27, 2001, following several rounds of briefing and oral arguments, the trial court issued nearly identical written orders in each case entering summary judgments in favor of the defendants.
It is undisputed for purposes of this appeal that Lofton's escape from the chain gang was the result of a tragic succession of errors on the part of the defendants. Lofton had been convicted on December 15, 1995, of rape in the first degree, robbery in the first degree, and burglary in the first degree, all rising out of incidents that occurred during a one-day sequence of events. He received three life sentences, to be served consecutively. Lofton's arrest record began in 1989, and included a history of an escape from a youth center in 1993, an escape from jail in Mobile in 1995, and a second escape from a Mobile incarceration facility later that same year. Following his 1995 convictions and sentences, he was initially imprisoned at Draper Correctional Facility and was classified as a medium-security inmate. After difficulties in that institution, he was transferred to Limestone, also a medium-security prison, in May 1996.
At Limestone, Lofton was regarded as a "troublemaker," and, on December 27, 1996, he was put on the disciplinary chain gang for rules violations; he remained assigned to that chain gang continuously until his escape six months later. On April 18, 1997, after Lofton had been involved in a serious physical altercation with two correctional officers at the facility, in the course of which he had taken a baton from one of the officers, a reclassification hearing was held by the local prison board to determine if he should be reclassified to a higher level of security. The local board recommended that he be reclassified to maximum security; that recommendation was forwarded to the central review board in Montgomery for final determination. On May 14, 1997, the central review board concurred and classified Lofton as a maximum-security prisoner, ordering that he be transferred to Donaldson Correctional Facility in Jefferson County.
Notification of that reclassification was received by mail at Limestone on May 30, 1997. Under normal procedure, the reclassification notice should have been brought to the personal attention of Hayes, and it would then have become his official responsibility to notify all appropriate prison personnel of the change in Lofton's status. Apparently because of a secretarial vacancy in the classification unit, the envelope containing the reclassification notification was opened by a classification specialist in the unit, date-stamped as having been received, and then placed in Hayes's "filings," described as a stack of papers accumulated on a bookcase shelf in the secretarial area to await Hayes's attention. As a matter of established procedure, the reclassification notification should have been brought directly to Hayes's attention, either by placing it in his "mail box" or by delivering it to him personally. Apparently preoccupied with other demands of his job, Hayes did not check his "filings" at any time before Lofton's escape. Accordingly, Lofton was not transferred from Limestone to Donaldson, nor was he removed from the chain gang, which was allowed to work outside of the institution.
Evidence was presented showing that proper institutional procedure required that Lofton be presumptively reclassified to "close" supervision immediately following the recommendation by the local prison board, while awaiting a decision from the central review board. That was the understanding of Deputy Warden Wise, but it was Hayes's understanding that Lofton would remain in his existing classification *25 while awaiting a decision of the central review board. An interim reclassification to "close" supervision would have removed Lofton from the chain gang. Hayes understood that a reclassification decision from the central review board could take as long as 12 weeks and that it usually took 6 to 8 weeks. Hayes acknowledged that, when prison personnel checked "the computer" immediately after they became aware of Lofton's escape, they found that a separate notification by the central review board of Lofton's reclassification to "maximum custody" had been transmitted. Because of the "snafu" whereby notification of Lofton's reclassification by the central review board was not acted upon before his escape, and because of the failure to presumptively reclassify him while awaiting that notification, Lofton was once again allowed to leave the prison premises on June 25, 1997, as a member of the chain gang.
He and the other 36 inmates composing the chain gang that day were restrained in "leg irons" (also referred to in the record as "leg shackles" or "leg cuffs"), but the particular brand of leg irons used were notoriously ineffective. The prison armorer testified by deposition that the leg irons "could be easily picked" using a handcuff key, and that "handcuff keys were readily available. Anybody could get hold of a handcuff key." According to the armorer, the leg irons were also "loose," because of excessive "play within the ratchet and the frame of the equipment." The armorer also testified that he communicated his concerns about the ineffectiveness of the leg irons to Warden Hooks "and kept reinforming him." Deputy Warden Wise also testified that he was aware of numerous problems with the leg irons. He acknowledged that complaints he had heard concerning them included that the leg irons were easy to shake off or take off, that prisoners could unlock them simply by using a paper clip, and that they could be disengaged by striking them with a sledge hammer, which was available to the chain-gang members. Wise testified that Limestone did change the leg irons it used, but not until after Lofton's escape. Officer Yarbrough testified that he was aware of the problems with the leg irons from the first time he used them, testifying that "[t]hose chains popping off were so commonplace that if you called a supervisor every time a chain popped off to get him to come down there, and put them on, all the supervisor would be doing all day is riding around putting chains back on legs." Deputy Warden Wise testified on deposition that he had voiced his concerns about the leg irons to Warden Hooks.
Despite knowledge of the problems with the leg irons, their use was one of the reasons given by the institution as justification for increasing the size of chain gangs supervised by a single corrections officer from 35 members to up to 40 members. On the day of his escape, Lofton was a member of a 37-member chain gang. On that occasion, Yarbrough was the only correctional officer supervising the chain gang. Yarbrough was not aware that Lofton had been reclassified to maximum security. Yarbrough testified that by mid-day on June 25, 1997, the chain gang had completed its work, and, at the direction of his supervisors, he took the members to an inmate cemetery for their lunch break to "hide" them from the view of the general public until the end of the day. During the break, he allowed the chain-gang members to disperse to various parts of the cemetery, where headstones and other physical features prevented him from having a clear line of sight of all of the prisoners at all times. Shortly after lunch, he counted the prisoners and, for the first time, realized that Lofton and another inmate were missing.
*26 An official departmental report made following an investigation of Yarbrough's actions on the day in question concluded as follows:
"Officer Yarbrough picked a poor location (inmate cemetery) for a lunch break. Security is almost impossible for one officer at the cemetery location. Indications are that Officer Yarbrough was inattentive during the lunch break. Officer Yarbrough admitted he was talking to inmates at the lower end of the cemetery fence during the lunch break. Inmates and the two escapees claimed that Officer Yarbrough was talking about personal business and how to make money to inmates at the lower end of the fence. Officer Yarbrough did not notify his supervisor of an escape, only that he had an emergency. Information and statements indicate that Inmate Walter Harris left the disciplinary squad approximately 20 minutes prior to Lofton's escape. Indications are that both inmates were gone approximately one hour before the officer saw them missing."
When Deputy Warden Wise went to the hospital in Chattanooga to which Lofton was taken after he had been shot and captured at the Ryans' residence, he asked him how he had escaped and, more specifically, how he had gotten out of the leg irons. Lofton's responses to both questions, couched in scatological terms, were to the effect that both Yarbrough and the leg irons had been totally ineffectual.
In entering summary judgments for all four defendants, the trial judge expressly predicated his ruling solely on his interpretation of the application of the holding of Ex parte Donahoo, supra. Counsel for one of the defendants stated at oral argument before this Court on December 12, 2001, that the trial judge had never reached the issue of State-agent immunity because he had disposed of the entire case on the basis of the holding in Donahoo. Because of that pivotal role assigned that case by the trial judge, and because the parties have focused the bulk of their arguments submitted to this Court in their respective briefs and their oral argument on that case, it is deserving of particular attention.
The plaintiffs argue that Donahoo is inapplicable to the particular facts and to the class of defendants involved in these cases; that it should be overruled; and/or that its status as binding precedent should be redefined and restricted. The defendants understandably contend that Donahoo should continue to be applied to the full extent of its expressed holding. Accordingly, we revisit the rationale and holdings of Donahoo.
In that case, Thurman Donahoo was murdered by two former State prisoners "who were alleged to have been released from prison before they were legally eligible for parole." 479 So.2d at 1189. His widow, as executrix of his estate, sued various State officials, including the chairman and members of the Board of Pardons and Paroles, alleging wrongful death and alleging that each official had acted negligently or wantonly in his or her respective official capacity, and also "in bad faith, beyond or in excess of their authority; or under a mistaken impression of the `good time' law." 479 So.2d at 1189. Certain of the defendants jointly filed a motion for a summary judgment; the other defendants filed motions to dismiss. The latter motions were deemed to have been converted to motions for a summary judgment. The trial judge entered a summary judgment in favor of all defendants; the executrix appealed.
In order to better understand the procedural underpinnings of that appeal and the resultant implications for the holdings in *27 the case, we have gone to the official record of Donahoo as maintained by the clerk of this Court. See, e.g., International Bhd. of Teamsters v. Hatas, 287 Ala. 344, 353, 252 So.2d 7, 14 (1971); Durbin v. Durbin, 818 So.2d 396 (Ala.Civ.App.2000), reversed on other grounds, 818 So.2d 404 (Ala.2001). In doing so, we have determined that the motion for a summary judgment filed by some of the defendants in Donahoo contains no allegations of fact and was not supported by affidavits or other evidentiary materials. (Justice Adams, dissenting in the case, noted that "[a]s strange as it may seem, both parties agreed at oral argument that they had not engaged in discovery before the circuit court granted summary judgment for all defendants." 479 So.2d at 1195.) Rather, the motion argued as to the parole-board defendants relied only on the naked assertion that they were entitled to "discretionary-function" immunity as to the State-law claims and the naked assertion of counterpart immunity as to the claims of federal civil-rights violations. The motions to dismiss made only bare assertions of immunity under Art. I, § 14 of the Alabama Constitution and the Eleventh Amendment of the United States Constitution. The motion to dismiss was apparently deemed to have been converted to a summary-judgment motion because of the trial court's consideration of certain prison records and a parole board "Report of Investigation" attached to the opposition submission by the plaintiff. None of those materials, or any of the other filings of the parties, addressed the merit of the plaintiff's claim that the defendants had all acted in bad faith, beyond their authority, or under a mistaken impression of the law.
This Court disposed of the immunity defense as follows:
"Since the present plaintiff alleged that the defendants acted in bad faith, beyond their authority, or under a mistaken interpretation of the law, we must hold that the defendants were not protected by the terms of Section 14 [of Art. I, Alabama Constitution of 1901]."
479 So.2d at 1190. Given the state of the record, it is understandable why the Donahoo Court considered itself precluded from undertaking an analysis of the merits of the immunity defenses. The Court was obliged to regard them as neutralized by the plaintiff's allegations of bad faith and allegations that the defendants had acted beyond their authority or under a mistaken impression of the law. It was well established then (and, as will be discussed later in this opinion, continues to be well established under the controlling caselaw) that such allegations against a State official serve to preempt any defense of what was then referred to as "discretionary-function immunity" or, alternatively, "qualified immunity," and which is now denominated "State-agent immunity." See, e.g., Unzicker v. State, 346 So.2d 931 (Ala.1977) (confirming that an action brought against State officials for acts allegedly committed fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law could be maintained as an exception to the general protection of discretionary-function immunity). Accordingly, in Donahoo, given the state of the record before it, this Court felt obliged to forgo any consideration of the merits of the asserted discretionary-function immunities. That approach was deemed necessary because, as explained above, the Court was presented with essentially a "judgment on the pleadings" situation, there having been no evidence presented to the trial court to allow an appellate analysis of the factual underpinnings of the allegations.
Recently, however, we have developed the following "burden-shifting" process to resolve more definitively the *28 effect of such claims (e.g., bad faith) on an asserted State-agent-immunity defense:
"[A] State officer or employee is not protected by discretionary immunity if in performing his discretionary functions he willfully, maliciously, fraudulently, or in bad faith injures someone. [Nonetheless,] [o]nce a defendant demonstrates that a plaintiff's claims arise from the defendant's performance of a discretionary function [i.e., a function now entitling the defendant to State-agent immunity], the burden then shifts to the plaintiff to establish that the defendant acted in bad faith or with malice or willfulness, in order to deny the defendant discretionary immunity from suit. The applicability of the doctrine of discretionary function must be determined on a case-by-case basis, and it is a question of law to be decided by the trial court."
Ex parte Davis, 721 So.2d 685, 689 (Ala. 1998) (citations omitted).
"In order to claim the benefits of sovereign immunity, a State officer or employee bears the burden of showing that the plaintiff's claims arise from the officer or employee's performance of a discretionary duty on behalf of the State. Upon such a showing, the burden shifts to the plaintiff, who must show that the officer or employee acted fraudulently, willfully, maliciously, or in bad faith."
Ex parte Alabama Dep't of Transp., 764 So.2d 1263, 1268-69 (Ala.2000) (citation omitted). The "bad-faith" exception to the availability of State-agent immunity has more recently been phrased as follows:
"[I]f any employee failed to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist, or acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law, then it is possible that that employee would not be entitled to State-agent immunity."
Ex parte Butts, 775 So.2d 173, 178 (Ala. 2000) (adopting the "new test" for determining when State employees sued in their individual capacities are entitled to assert the defense of State-agent immunity, as formulated by a plurality of the Court in Ex parte Cranman, 792 So.2d 392 (Ala. 2000)).
Justice Adams recommended in his Donahoo dissent that the case be remanded to conduct extensive discovery. "I would not reach the question of duty at this stage of the litigation." 479 So.2d at 1195. It was obviously Justice Adams's view that the State-agent-immunity defense should have been fully developed factually, and that "[t]hen, and only then, would we reach the issue of duty dealt with in the majority holding." 479 So.2d at 1195. (It was perhaps technically incorrect to refer to a "majority holding" as to the issue of duty, because the holding on that issue received the votes of only four of the nine Justices participating.)
What was that "issue of duty" as dealt with in the main opinion? The Court phrased it as follows: "Whether the defendants owed a legal duty to the decedent to protect him from the paroled prisoners." 479 So.2d at 1189. (Emphasis supplied.) The Court then declared that, "[n]otwithstanding the fact that the defendants were not entitled to summary judgment based on the defense of sovereign immunity, their summary judgment was nevertheless proper because they did not owe any legal duty to the decedent." 479 So.2d at 1190. The Court came to that conclusion based on the holdings of two cases from foreign jurisdictions, Orzechowski v. State, 485 A.2d 545 (R.I.1984), and Thompson v. County of Alameda, 27 Cal.3d 741, 614 P.2d 728, 167 Cal.Rptr. 70 (1980).
*29 Both of those cases analyzed the extent of any duty that should be imposed upon parole-board members with respect to a member of the general public injured by the criminal conduct of a paroled prisoner. Because of the special policy considerations attending the duties exercised by a parole board, the Orzechowski court, citing one of its earlier cases which, in turn, had cited Thompson, supra, declared "we decline to recognize a special duty owed by the parole board to a private individual injured by a parolee, at least in the absence of an allegation that defendants knew or reasonably should have known of a threat to the specific plaintiff." 485 A.2d at 549. The Thompson court, for its part, had gone to great lengths to explain the practical considerations driving such a public-policy-orientated position:
"By their very nature parole and probation decisions are inherently imprecise. According to a recent study by the California Probation Parole and Correction Association, during 1977 in California a total of 315,143 persons (225,331 adults and 89,912 juveniles) were supervised on probation. (The Future of Probation, A Report of the CPPCA Committee on the Future of Probation (July 1979) p. 15.) During the same year, cases removed from probation because of violations totaled 13.4 percent in the superior courts, 14.8 percent in the lower courts, and 11.5 percent in the juvenile courts. (Id., at pp. 27-28.) Additionally, a large number of parole violations occur. National parole violation rates reflect that 18-20 percent of parolees fail on one-year follow-up, 25 percent on two-year follow-up, and 26 percent on three-year follow-up. (Id., at p. 35.) Although we fully recognize that not all violations involve new or violent offenses, a significant proportion do.
"Notwithstanding the danger illustrated by the foregoing statistics, parole and probation release nonetheless comprise an integral and continuing part in our correctional system authorized by the Legislature, serving the public by rehabilitating substantial numbers of offenders and returning them to a productive position in society. The result, as we observed in Johnson [v. California, 69 Cal.2d 782, 447 P.2d 352, 73 Cal.Rptr. 240 (1968) ], is that `each member of the general public who chances to come into contact with a parolee bear[s] the risk that the rehabilitative effort will fail....' (69 Cal.2d at p. 799[, 73 Cal. Rptr. at p. 252, 447 P.2d at p. 364].) The United States Supreme Court very recently reached a similar conclusion in Martinez v. California (1980) 444 U.S. 277[, 62 L.Ed.2d 481, 100 S.Ct. 553, 557]. In Martinez, the high court rejected a contention that the California governmental immunity statutes (Gov.Code, § 845.8 in particular) deprived plaintiffs' decedent of her life without due process of law because of a parole decision that led indirectly to her death. (Martinez, 444 U.S. at p. 280-281[, 62 L.Ed.2d at pp. 486-487, 100 S.Ct. at p. 557].) The Supreme Court observed that `the basic risk that repeat offenses may occur is always present in any parole system.' (Ibid.)
"Bearing in mind the ever present danger of parole violations, we nonetheless conclude that public entities and employees have no affirmative duty to warn of the release of an inmate with a violent history who has made nonspecific threats of harm directed at nonspecific victims. Obviously aware of the risk of failure of probation and parole programs the Legislature has nonetheless as a matter of public policy elected to continue those programs even though such risks must be borne by the public. (See Beauchene v. Synanon Foundation, *30 Inc. (1979) 88 Cal.App.3d 342, 347[, 151 Cal.Rptr. 796].)"
27 Cal.3d at 753-54, 614 P.2d at 734-35, 167 Cal.Rptr. at 76-77.
Although the Donahoo four-Justice plurality relied almost exclusively on the particular responsibilities and burdens of parole officials in reaching its "no-duty" holding, the plurality nonetheless expressed the duty formulation in much broader terms than was necessary, stating comprehensively that "we will follow the line of cases holding that in order to establish liability on the part of State officials, the plaintiff must plead and prove that the officials knew or should have known that an aggressor might be a danger to a specific individual." 479 So.2d at 1190 (emphasis supplied). The three members of the Donahoo court who concurred specially would have avoided reaching the duty analysis, in similar vein to the two dissenters, in preference to deciding the case on the basis of immunity. Those three Justices were
"of the opinion that mere allegations of bad faith should not strip parole officers of their immunity for acts committed in the course of their duties. In fact, parole officers should be protected by the same absolute immunity afforded judges, because the function of the parole board is more akin to that of a judge than to that of an administrative officer. Pate v. Alabama Board of Pardons & Paroles, 409 F.Supp. 478 (M.D.Ala.1976)."
479 So.2d at 1192.
We do not today withdraw our support for the rationale and ruling in Donahoo insofar as it relates to parole officials. Their unique and peculiar duties and responsibilities to parole some prisoners while electing to deny or defer paroles to others, all as statutorily mandated, and their lack of any ability to have anything other than periodic and relatively brief direct contact with the parolees, dictate against any withdrawal from them of the protection afforded by the special-duty rule of Donahoo. We, however, consider that the plurality holding in Donahoo painted with too broad a brush stroke, given, in the words of Justice Adams, "the far-reaching ramifications" of the decision. 479 So.2d at 1195. It is those far-reaching ramifications that we elect to rein in today, insofar as the Donahoo rule was expressed in terms of the duty owing by any and all State officials, rather than just by parole officials. As to the wide variety of State agents who do not make parole decisions, the duty analysis must take place on a case-by-case basis, taking into consideration all of the dynamics of the particular jobs of those State agents.
Unlike the incomplete procedural status presented the Court in Donahoo, the parties in the present case have conducted fairly voluminous discovery, including depositions of all defendants, and none of the plaintiffs opposed final submission of the motions for a summary judgment on the basis that relevant discovery remained to be completed with respect to either the State-agent-immunity defense or the issue of duty. Therefore, the record appears to provide the trial court with full development of all facts relevant to a resolution of both the immunity issue and the duty issue.
In Cranman, supra, a plurality of this Court offered the following restatement of the rule governing State-agent immunity, which was subsequently adopted by the full Court in Ex parte Butts, supra:
"A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's

*31 "(1) formulating plans, policies, or designs; or
"(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"(a) making administrative adjudications;
"(b) allocating resources;
"(c) negotiating contracts;
"(d) hiring, firing, transferring, assigning, or supervising personnel; or
"(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
"Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
"(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
"(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."
792 So.2d at 405. It is to be noted that the situations listed in subparagraphs (2)(a)-(d) of the Cranman immunity rule are expressly only "examples" of the general principle stated in paragraph (2) itself.
We today overrule Donahoo to the extent that it announced a rule of duty that comprehensively and indiscriminately embraced all State officials, rather than just parole officials, the special class of State officials to which its rationale was directed; therefore, we must remand this case for further consideration. On remand, the trial court shall address the duty issue and/or the immunity issue, as it sees fit and in the order it sees fit, because both issues are factually ripe for determination. Generally, however, the defense of State or State-agent immunity should be determined as a threshold issue. "One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).
"Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is `an entitlement not to stand trial or face the other burdens of litigation.' Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The privilege is `an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.' Ibid. As a result, `we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.' Hunter v. Bryant, *32 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam)."
Saucier v. Katz, 533 U.S. 194, 199-202, 121 S.Ct. 2151, 2155-56, 150 L.Ed.2d 272 (2001).
Consideration of the immunity issues ahead of the duty issue in this case would not violate the rule of abstention that generally advances to the forefront nonconstitutional bases for decision, lest unnecessary constitutional issues be decided, because the issues of immunity do not represent uncharted areas of constitutional law. For example, we routinely accept for interlocutory review a denial of an immunity defense in a case against a State agent without concern for the prematurity of resolution of a defense grounded in our constitution ahead of other defenses that might apply under principles of general tort law, because we recognize the priority of treatment that should be accorded a properly asserted immunity defense. That is why we elect to review denials of such immunity claims by accepting an interlocutory appeal pursuant to Rule 5, Ala. R.App. P., or by ordering answer and briefs in response to a petition for a writ of mandamus, pursuant to Rule 21, Ala. R.App. P. Ex parte Purvis, 689 So.2d 794 (Ala.1996); Ex parte Davis, 721 So.2d 685 (Ala.1998); Ex parte Alabama Dep't of Transp., supra; Ex parte Rizk, 791 So.2d 911 (Ala.2000) (ordering and receiving answer and briefs to address the immunity defense on the merits but ultimately denying the writ); Ex parte Mobile Dep't of Human Res., 815 So.2d 527 (Ala.2001).
Even in instances where the issue has been presented to us on interlocutory review of a denial of a motion to dismiss the complaint predicated on an assertion of immunity, but where issues of fact unresolved at the trial level preclude recognition of the defense at that stage, we have emphasized the possibility of a later-stage interim review. In that regard we have explained that once the parties have had the opportunity to conduct discovery, the defendants would have the opportunity to seek a summary judgment on the ground that they were entitled to State-agent immunity, and that if such a motion was made and was denied by the trial court, review of the ruling could then be sought from this Court, either pursuant to an interlocutory appeal under Rule 5, Ala. R.App. P., or by a petition for a writ of mandamus filed pursuant to Rule 21, Ala. R.App. P. Ex parte Butts, supra, and Ex parte Mobile County Dep't of Human Res., supra. "[I]t is the rare case involving the defense of [State-agent] immunity that would be properly disposed of by a dismissal pursuant to Rule 12(b)(6), [Ala. R. Civ. P.]." Patton v. Black, 646 So.2d 8, 10 (Ala.1994).
Requiring resolution of an immunity defense before, or at least in tandem with, other underlining defenses involving substantive principles of tort law permits us to avoid development of unnecessarily restricted principles of tort law driven by the need to accommodate principles of State-agent immunity. Because we have removed the binding precedential effect of the Donahoo duty rule insofar as it relates to all State officials rather than just to parole officials, we decline, in remanding this case for consideration of the immunity issues, along with the duty issue, to speculate on the proper resolution of the duty issue that might ultimately need to be addressed. For one thing, a determination of the immunity issues, if adverse to the plaintiffs with regard to one or more of the defendants, would obviate the necessity for defining the extent and the scope of the duty, if any, that that particular defendant might owe to persons situated as are the present plaintiffs.
*33 We do not imply by anything we have said in this opinion that we have a predetermined view as to how the trial judge should rule with respect to the immunity defenses. Accordingly, the parties should infer no such predisposition on our part. Just as nothing we have said should be taken to imply any predisposition on our part with regard to how the immunity defenses and asserted exceptions thereto are resolved by the trial court, nothing we have said in this opinion should be taken to imply any predisposition on our part with regard to a proper resolution of the duty issue, to the extent the trial court elects to reach that issue as to one or more of the defendants. We are not rejecting the possibility that, in an appropriate fact situation, a no-duty rule similar to that adopted in Donahoo could properly be recognized for a special class of State agents. We are simply removing any pedigree attached to the rule of duty announced in Donahoo with regard to any duty owed by any State official other than a parole official. We have today overruled Donahoo to the extent that it announced a no-duty rule as to all State officials, not just parole officials.
Accordingly, for the various reasons expressed herein, and for the purposes described herein, we reverse the summary judgments separately entered for each of the defendants, and remand the cases for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, SEE, LYONS, JOHNSTONE, and WOODALL, JJ., concur.
MOORE, C.J., and BROWN, J., concur in the result.
STUART, J., dissents.
STUART, Justice (dissenting).
I respectfully dissent. I would affirm the trial court's judgments.