6 So.3d 478 (2008)
Ex parte AUBURN UNIVERSITY, Dr. Jay Gogue, and Dr. Gaines Smith.
(In re Brenda M. Allen et al.
v.
Auburn University et al.).
1070174.
Supreme Court of Alabama.
October 3, 2008.
*479 David R. Boyd, Dorman Walker, and Kelly F. Pate of Balch & Bingham, LLP, Montgomery; and Lee F. Armstrong, gen. counsel, Auburn University, for petitioners.
Jim L. DeBardelaben, Montgomery; and James B. Sprayberry, Auburn, for respondents.
BOLIN, Justice.
Auburn University, its president Dr. Jay Gogue,[1] and Dr. Gaines Smith (hereinafter collectively referred to as "the petitioners"), *480 petition this Court for a writ of mandamus directing the Lee Circuit Court to enter a summary judgment in their favor based on sovereign immunity and State-agent immunity as to the claims asserted against them by Brenda M. Allen, Austin K. Hagan, Charles C. Mitchell, Jr., James L. Novak, J. Walter Prevatt, Eugene H. Simpson III, and James O. Donald (hereinafter collectively referred to as "the plaintiffs"), all tenured professors employed by Auburn University ("the University").

Facts and Procedural History
The plaintiffs are faculty members in both the College of Agriculture and the School of Forestry and Wildlife Sciences. Before the 1987-1988 academic year, the plaintiffs were designated as federal Schedule A appointees employed by the University-affiliated Alabama Cooperative Extension Systems ("ACES") as extension specialists. ACES delivers research findings/information of the various land-grant universities to Alabama's farmers. As Schedule A appointees, the plaintiffs were eligible for certain federal benefits, including participation in the Federal Civil Service Retirement System. During the 1987-1988 academic year, the University's Board of Trustees approved a reorganization of the University's administrative structure. As part of this reorganization, the plaintiffs were merged into the College of Agriculture and the School of Forestry and Wildlife Sciences as faculty members and were given rank and tenure. Each plaintiff was given the title "Extension Specialist & Professor" and was no longer considered an ACES employee. However, the plaintiffs, as Schedule A appointees, remained eligible for federal benefits, including the participation in the Federal Civil Service Retirement System.
Before 1997, faculty in the University's College of Agriculture and School of Forestry and Wildlife Sciences were hired on 12-month appointments. Under the 12-month appointments, the faculty members worked for the University year-round. Beginning in 1997, the University began hiring faculty in the University's College of Agriculture and School of Forestry and Wildlife Sciences on nine-month appointments. The University also allowed faculty members who had been hired before 1997 to convert from 12-month appointments to 9-month appointments. Chapter 7, § B. 1., of the University's Faculty Handbook provides:
"Faculty participation in programs and projects administered or conducted by the University and supported by extramural contracts, grants, or other types of agreements shall be considered a part of the faculty member's responsibilities to the University. During the time that a faculty member is under contract to the University, be it on a nine-month or a 12-month appointment, the individual is expected to fulfill his or her total responsibilities. Therefore, if a faculty member is participating in an extramural program or project within the University, whether it is in his or her own or a different department or division of the University, an appropriate part of the faculty member's salary shall be provided by the program or project budget. Under these circumstances, no increase in the faculty member's base compensation shall be permitted."
The import of this policy is that a faculty member on a nine-month appointment is free to supplement his or her salary by pursuing other opportunities, such as research grants through extramural funding, during the three months of the year that he or she is not obligated to the University. A faculty member on a 12-month appointment is obligated to the University on *481 a year-round basis and is unable to supplement his or her base salaries through extramural funding because participation in externally funded programs during the period of the faculty member's appointment, whether it be 9 months or 12 months, is considered part of the faculty member's responsibility to the University and a portion of that faculty member's salary is already provided for by the externally funded program.
When a faculty member converts from a 12-month appointment to a 9-month appointment, that faculty member agrees to a permanent reduction in his or her base salary to approximately 91% of his or her 12-month salary. Faculty members who were converting from 12-month appointments to 9-month appointments were guaranteed by the University two summer salaries at 25% of the 9-month base salary until extramural funding could be obtained. Once the University had met its commitment as to the summer salaries, it was the faculty member's responsibility to obtain extramural funding to supplement his or her nine-month base salary, and there was no guarantee that the faculty member could obtain the extramural funding.
Dr. Smith, the interim director of ACES during the conversion, contacted the United States Department of Agriculture ("the USDA") in June 2002, to inquire as to the possibility of Schedule A appointees converting from 12-month appointments to 9-month appointments. The USDA responded that Schedule A appointees were not eligible for nine-month appointments, stating that Schedule A appointees must be "employed [by the University] under a permanent year round arrangement with Extension functions being performed at least 50% of the time throughout the entire year."
Section 7220 of the Farm Security and Rural Investment Act of 2002 terminated all Schedule A appointments on January 31, 2003. However, the plaintiffs, as former Schedule A appointees, remained eligible for participation in the Federal Civil Service Retirement System under the Farm Security and Rural Investment Act if the plaintiffs remained employed by the University on a permanent year-round basis with at least 50% of their employment time being devoted to extension functions. ACES is required to certify annually to the USDA that the former Schedule A appointees are meeting the USDA's requirements in order to maintain their eligibility for the Federal Civil Service Retirement. These former Schedule A appointees were also permitted to begin participating in the State of Alabama Retirement Systems at a rate of 50% of their annual salaries. The vast majority of the University's faculty, who are not former Schedule A appointees, are not eligible to participate in the Federal Civil Service Retirement System.
In April 2005, the plaintiffs expressed to Dr. Smith their discontent with being denied the opportunity to participate in the nine-month conversion process afforded the other faculty members in their departments. The plaintiffs had determined that their being denied the opportunity to participate in the nine-month conversion process had resulted in their annual compensation levels falling below those of their colleagues who were not former Schedule A appointees, who had been allowed to convert to nine-month appointments. The plaintiffs requested an increase of 13.75% to 21.13% in their base salary in order, they said, to create equity with the salaries of their colleagues who, as nine-month appointees, were allowed to enhance their salaries through extramural sources during the summer months.
*482 Dr. Smith responded to the plaintiffs by letter in June 2005, expressly informing the plaintiffs that conversion from 12-month appointments to nine-month appointments was prohibited by the federal regulations of the USDA. Dr. Smith also denied the plaintiffs' requested salary increases as unjustified, explaining:
"There are two additional points to consider. First, all faculty who have elected to convert their salaries at 91% or less have opted to have their base salary reduced permanently. While summer salary, whether guaranteed or funded from funds raised by the faculty member, increases compensation, it does not increase the base salary for these individuals.
"Secondly, after summer funding commitments are met, then the faculty member is responsible for raising funds for additional compensation. There is a risk for the individual that the funds will not be available. By electing to shift to a nine-month appointment, the individual has assumed the risk.
"Therefore, based on these points relating to the conversions, the requested increase in base salary for a continuing 12-month appointment would place your benefits substantially above others in the College. Further, the average salary of your group making this request is 120% of the southern region average for Extension specialists. Hence, your requested salary adjustments are not approved."
Although Dr. Smith denied the plaintiffs' request to increase their salaries, he did offer the plaintiffs the following option:
"There is, however, another straightforward process for removing the circumstances that disallows you to be on a nine-month appointment; that is, your former Schedule A federal appointment that requires a 12-month appointment can be ended through retirement or job abolishment. As the designated administrator responsible for the management of federal Schedule A appointees, I have the authority to abolish your current position making you eligible to receive an immediate federal retirement annuity and free to negotiate a nine-month appointment as others in the College of Agriculture have done.
"For those eligible, the same can be accomplished through regular retirement.
"Let me know if there is any interest in either of these options. We can initiate the process immediately."
The plaintiffs rejected this option, apparently because they did not want to forgo their federal benefits.
In sum, the plaintiffs, as former Schedule A appointees, are prohibited by federal regulations from converting from 12-month appointments to 9-month appointments; if they converted to 9-month appointments, they would lose their eligibility to participate in the Federal Civil Service Retirement System. University policy prohibits the plaintiffs, as 12-month appointees, from supplementing their base salaries through participation in externally funded programs.
On January 31, 2006, the plaintiffs sued the University; its president, Dr. Ed Richardson,[2] in his official capacity; and Dr. Smith, in both his official and individual capacities, alleging against all the defendants a denial of their equal protection as established by the Constitution of Alabama of 1901 and age discrimination under the Alabama Age Discrimination in Employment Act, § 25-1-20 et seq., Ala.Code 1975. The petitioners answered the complaint *483 on March 13, 2006, asserting, among other things, that they were immune from suit based on the doctrine of sovereign immunity and State-agent immunity and that the complaint failed to state a claim upon which relief could be granted.
The plaintiffs amended their complaint on August 22, 2006, to assert a fraud claim against the University, the president of the University (now Dr. Gogue), in his official capacity, and Dr. Smith, in his official and individual capacities. The plaintiffs also alleged that Dr. Smith had acted beyond the scope of his authority in denying the plaintiffs' request for increases in their base salaries. The petitioners answered the amended complaint on November 8, 2006, again asserting the doctrines of sovereign immunity and State-agent immunity. The petitioners also asserted that the amended complaint failed to state a claim upon which relief could be granted.
Both sides moved the trial court for summary judgments and filed briefs in support of their respective motions.[3] On September 14, 2007, the trial court entered an order denying the summary-judgment motions and expressly determining: (1) that the "issues involving sovereign immunity" would be decided during the course of the trial and (2) that an issue of fact existed as to whether Dr. Smith had acted beyond his authority, which would have removed him from the protection of State-agent immunity as to the plaintiffs' claims asserted against him in his individual capacity. This petition followed.

Standard of Review
This Court has stated:
"`While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion grounded on a claim of immunity is reviewable by petition for writ of mandamus. Ex parte Purvis, 689 So.2d 794 (Ala. 1996)....
"`Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule 56(c)(3), Ala. R. Civ. P., Young v. La Quinta Inns, Inc., 682 So.2d 402 (Ala.1996). A court considering a motion for summary judgment will view the record in the light most favorable to the nonmoving party, Hurst v. Alabama Power Co., 675 So.2d 397 (Ala.1996), Fuqua v. Ingersoll-Rand Co., 591 So.2d 486 (Ala.1991); will accord the nonmoving party all reasonable favorable inferences from the evidence, Fuqua, supra, Aldridge v. Valley Steel Constr., Inc., 603 So.2d 981 (Ala.1992); and will resolve all reasonable doubts against the moving party, Hurst, supra, Ex parte Brislin, 719 So.2d 185 (Ala. 1998).
"`An appellate court reviewing a ruling on a motion for summary judgment will, de novo, apply these same standards applicable in the trial court. Fuqua, supra, Brislin, supra. Likewise, the appellate court will consider only that factual material available of record to the trial court for its consideration in deciding the motion. Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278 (Ala.1991), Boland v. Fort Rucker Nat'l Bank, 599 So.2d 595 (Ala.1992), Rowe v. Isbell, 599 So.2d 35 (Ala.1992)."'
Ex parte Turner, 840 So.2d 132, 135 (Ala. 2002) (quoting Ex parte Rizk, 791 So.2d 911, 912-13 (Ala.2000)). A writ of mandamus is an extraordinary remedy available *484 only when the petitioner demonstrates: "`(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.'" Ex parte Nall, 879 So.2d 541, 543 (Ala.2003) (quoting Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala.2001)).

Discussion
The petitioners argue that the trial court erred in choosing to address their sovereign-immunity defenses at trial rather than addressing at the summary-judgment stage of the litigation. "`One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit.'" Ryan v. Hayes, 831 So.2d 21, 31 (Ala.2002) (quoting Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). Additionally, this Court has stated:
"`Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Ibid. As a result, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam).'"
Ryan, 831 So.2d at 31-32 (quoting Saucier v. Katz, 533 U.S. 194, 199-202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).
The trial court reasoned that because the parties had waived the right to a jury trial in this case, in favor of a bench trial, that a "great deal of costs and expense" associated with a jury trial would be alleviated. However, by delaying until trial its determination of the sovereign-immunity defenses asserted by the petitioners, the trial court has effectively denied the petitioners their privilege of not being subjected to suit and their right to not stand trial and face the burdens of litigation should their immunity defenses prove dispositive. Ryan, supra. Accordingly, we conclude that the trial court erred in failing to address the sovereign-immunity defenses at the summary-judgment stage of the litigation.
The petitioners next argue that the trial court erred in finding that a genuine issue of fact existed as to whether Dr. Smith had acted fraudulently or beyond his authority thereby removing him from the protection of State-agent immunity.[4]
*485 In Ex parte Cranman, 792 So.2d 392 (Ala.2000), a plurality of this Court restated the test for determining when a State employee is entitled to State-agent immunity:
"A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"(1) formulating plans, policies, or designs; or
"(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"(a) making administrative adjudications;
"(b) allocating resources;
"(c) negotiating contracts;
"(d) hiring, firing, transferring, assigning, or supervising personnel; or
"(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
"Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
"(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
"(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."
792 So.2d at 405. Although Cranman was a plurality decision, the restatement of law as it pertains to State-agent immunity set forth in Cranman was subsequently adopted by this Court's decisions in Ex parte Rizk, 791 So.2d 911 (Ala.2000), and Ex parte Butts, 775 So.2d 173 (Ala.2000).
Additionally, this Court has stated:
"This Court has established a `burden-shifting' process when a party raises the defense of State-agent immunity. Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala.2003). In order to claim State-agent immunity, a State agent bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity. Giambrone, 874 So.2d at 1052; Ex parte Wood, 852 So.2d 705, 709 (Ala.2002). If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority. Giambrone, 874 So.2d at 1052; Wood, 852 So.2d at 709; Ex parte Davis, 721 So.2d 685, 689 (Ala.1998). `A State agent acts beyond authority and is therefore not immune when he or she "fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist."' Giambrone, 874 So.2d at 1052 (quoting Ex parte Butts, 775 So.2d 173, 178 (Ala. 2000))."
*486 Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala.2006).
Dr. Smith, as the interim director of ACES during the period faculty members were converting from 12-month appointments to 9-month appointments, exercised his judgment in the administration of that agency, thereby establishing that he was engaged in a function that would entitle him to State-agent immunity. Ex parte Cranman, supra. Therefore, the burden then shifted to the plaintiffs to show that that Dr. Smith acted willfully, maliciously, fraudulently, in bad faith, or beyond his authority in order to remove Dr. Smith from the protection of State-agent immunity. Ex parte Estate of Reynolds, supra.
The plaintiffs alleged in their complaint that Dr. Smith fraudulently represented to them that federal regulations prohibited the plaintiffs, as former Schedule A appointees, from supplementing their base salaries with externally funded programs when, in fact, it was University policy, not federal regulations, that prohibited the plaintiffs from supplementing their salaries as 12-month appointees. Assuming that Dr. Smith did misrepresent to the plaintiffs that federal policy prevented them from supplementing their salaries, we nevertheless conclude that Dr. Smith's conduct did not fall within the willful, malicious, and fraudulent exception to State-agent immunity.[5] The plaintiff in Segrest v. Lewis, 907 So.2d 452 (Ala.Civ.App.2005), was employed with the Retirement Systems of Alabama ("the RSA") as an administrative support assistant I. During her probationary period, the plaintiff interviewed for a similar position with the State Board of Pardons and Paroles ("the Parole Board"). On March 18, 2002, the Parole Board decided to employ the plaintiff. On March 20, 2002, William Segrest, then the executive director of the Parole Board, sent the plaintiff a letter informing her that she had been approved for employment with the Parole Board and that she was to report to work on April 8, 2002, to begin her employment. However, the State Personnel Department did not approve the plaintiff's transfer from the RSA to the Parole Board.
In reliance upon the letter from Segrest, the plaintiff, on March 22, 2002, sent a letter to the RSA stating that she would be leaving the RSA on April 5, 2002, to assume a position with the Parole Board. However, because the State Personnel Department had not approved the plaintiff's transfer to the Parole Board, she requested that she be allowed to retract her resignation from her employment with the RSA. The RSA informed the plaintiff on April 2, 2002, that her request to retract her resignation could not be approved because her resignation had been accepted and a "Certification of Candidates" had been issued to fill her position. Segrest, supra.
On May 3, 2002, the plaintiff sued Segrest, among others, seeking to enforce Segrest's "commitment to employ" her. She also alleged fraudulent misrepresentation and sought backpay and benefits. On December 5, 2003, the trial court entered a *487 judgment in favor of the plaintiff, and Segrest appealed. Segrest, supra.
The plaintiff argued on appeal that Segrest's conduct in communicating the decision to employ her fell within the exception to State-agent immunity that applies when a State agent "acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." Ex parte Cranman, 792 So.2d at 405. In reversing the decision of the trial court, the Court of Civil Appeals determined that the facts of the case were such that Segrest was protected from liability by the doctrine of State-agent immunity. The court stated:
"We do not read this provision from Ex parte Cranman [, 792 So.2d 392 (Ala. 2000),] and Ex parte Butts [, 775 So.2d 173, 178 (Ala.2000)], nor do we read any of the progeny of those cases, as holding that an innocent misrepresentation by a state agent falls outside the protection that for so long has been provided by our law to state officials and employees while acting within reason and in good faith in the discharge of their responsibilities to the public. If something more were not required in order for conduct to fall within the exception relied upon by [the plaintiff], that exception would `swallow' the whole of the general rule of immunity itself. Any misrepresentation is beyond the authority of a state agent. Indeed, any misstep by any state employee or other state agent that wrongs another can be said to be beyond his or her authority and/or committed under a mistaken interpretation of the law. Construing the exception at issue in the manner urged by [the plaintiff] would mean that missteps by a state agent, no matter how innocently or reasonably taken, would in every case pull the agent out from under the umbrella of state agent immunity provided by Ex parte Cranman and Ex parte Butts and supported by the results reached in decades of decisions that preceded those cases. See Howard v. City of Atmore, 887 So.2d 201, 206 (Ala.2003) (Cranman is a `restatement of the law of immunity, not a statute'). Our conclusion in this regard is supported by the fact that the word `fraudulently' appears in the exception articulated in Ex parte Cranman and Ex parte Butts sandwiched between the terms `willfully, maliciously,' and `in bad faith. Cf. King v. St. Vincent's Hosp., 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (quoting NLRB v. Federbush Co., 121 F.2d 954, 957 (2d Cir.1941)) ("`Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used....'").
"Our conclusion in this regard also is consistent with the manner in which our appellate courts have applied the principles of immunity to state agents both before and after Ex parte Cranman and Ex parte Butts. Compare, e.g., Byrd v. Lamar, 846 So.2d 334 (Ala.2002) (holding that acts of promissory fraudwhich require proof that the defendants intended not to perform promised acts were not protected by state-agent immunity); Tuscaloosa County v. Henderson, 699 So.2d 1274, 1277 (Ala.Civ.App.1997) (holding that state-agent immunity was not available to a county employee who sued the plaintiff and had him arrested for operating without a business license because the evidence showed that, in so doing, the defendant acted with `malice, willfullness, or ... so beyond his authority that sovereign immunity would not apply' (footnote omitted)); Ex parte Tuscaloosa County, 796 So.2d 1100, 1106-07 (Ala.2000) (holding that a state *488 agent was entitled to immunity notwithstanding the fact that there was sufficient evidence for a jury to return a verdict for malicious prosecution, because malice for purposes of malicious prosecution can be based upon a lack of probable cause but such `malice in law' is not enough to satisfy the Ex parte Cranman exception for acts committed `willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law'); Bayles v. Marriott, 816 So.2d 38 (Ala.Civ.App.2001)."
Segrest, 907 So.2d at 456-57.
In this case, Dr. Smith allegedly represented to the plaintiffs that federal regulations prohibited the plaintiffs from supplementing their 12-month salaries with externally funded programs, when in fact it was actually University policy that prohibited the plaintiffs from supplementing their salaries. Like the State agent in Segrest, Dr. Smith did no more than misspeak when he allegedly communicated to the plaintiffs that federal regulations prohibited them from supplementing their 12-month salaries. In fact, both the federal regulations and University policy acted together to prevent the plaintiffs from supplementing their salaries with externally funded programs. University policy prohibits 12-month appointees from supplementing their salaries, while the federal regulations prohibit the plaintiffs, as Schedule A appointees, from converting to nine-month appointments so as to be allowed to supplement their salaries. Dr. Smith simply miscommunicated to the plaintiffs the source of the prohibition against their supplementing their salaries. He did not miscommunicate to the plaintiffs that they were prohibited from supplementing their salaries. Nothing in the record before this Court indicates that Dr. Smith acted "willfully, maliciously, fraudulently, or in bad faith" so as to remove him from the umbrella of protection afforded him by State-agent immunity.
Although not entirely clear, it appears that the plaintiffs argued that Dr. Smith had acted beyond his authority in his June 2005 letter by offering, even though he allegedly lacked the authority to do so, to abolish "[their] current position making [the plaintiffs] eligible to receive an immediate federal retirement annuity and free to negotiate a nine-month appointment." The plaintiffs submitted the affidavit of Dr. James L. Smith, the former associate director for human resources for ACES, who testified that the plaintiffs were not ACES employees and that ACES had no authority over them.
The plaintiffs' contention that Dr. Smith acted beyond his authority in stating that he had the authority to abolish their positions fails for the same reasons that their contention that he acted fraudulently in communicating to them that federal regulations, and not University policy, prohibited them from supplementing their salaries. Assuming Dr. Smith did not have the actual authority to abolish the plaintiffs' positions, thus making them eligible to negotiate nine-month appointments, nothing in the record indicates that the plaintiffs' positions could not in fact be abolished by the person with the actual authority to do so, thereby making the plaintiffs eligible to negotiate nine-month appointments. In other words, Dr. Smith may have miscommunicated to the plaintiffs as to who actually had the authority to abolish their positions, but he did not miscommunicate when he stated that their positions could be abolished, thus making them eligible for nine-month appointments. Further, Dr. Smith also correctly informed the plaintiffs that they could become eligible for 9-month appointments if they simply resigned their 12-month positions. The *489 plaintiffs offer nothing in contradiction to this representation by Dr. Smith. Nothing in the record indicates that Dr. Smith was acting in bad faith when he miscommunicated to the plaintiffs that he had the authority to abolish their positions in order to make them eligible to negotiate nine-month appointments.
Accordingly, we conclude that Dr. Smith is entitled to State-agent immunity as to the claims asserted against him in his individual capacity by the plaintiffs in their amended complaint.
We grant the petition for a writ of mandamus and direct the trial court to address the petitioners' sovereign-immunity claims and to enter a summary judgment in favor of Dr. Smith as to the claims asserted against him in his individual capacity in the plaintiffs' amended complaint.
PETITION GRANTED; WRIT ISSUED.
COBB, C.J., and SEE, STUART, SMITH, PARKER, and MURDOCK, JJ., concur.
LYONS, J., concurs in the result.
LYONS, Justice (concurring in the result).
The complaint, as initially filed, contained two counts. Count one sought to enjoin the defendants from discriminating against the plaintiffs on the basis of age, as well as backpay, plus costs and reasonable attorney fees, pursuant to § 25-1-22, Ala. Code 1975. Count two sought damages for a denial of equal protection under the Alabama Constitution of 1901. An amended complaint added count three, seeking damages for intentional and willful misrepresentation of material facts and bad faith, and count four, seeking damages for action by Dr. Gaines Smith allegedly in excess of his authority.
The defendants moved for a summary judgment based upon 1) sovereign immunity, 2) the unavailability of relief against the State officials in their individual capacities on the age-discrimination claim because neither individual is the employer of the plaintiffs, 3) the absence of any provision for equal protection of the laws under the Alabama Constitution of 1901, and 4) failure of the fraud and bad-faith count (count three) to state a claim upon which relief can be granted. After receiving briefs and hearing arguments, the trial court entered what is best described as an oblique order that, among other things, stated: "[T]he remaining issue before the Court was whether or not Dr. Gaines Smith should be granted immunity." The trial court concluded that there was a genuine issue of material fact as to whether Dr. Smith had acted beyond his authority, justifying imposing individual liability under the exception recognized in Ex parte Cranman, 792 So.2d 392 (Ala.2000), for conduct beyond a State agent's authority. Specifically, the trial court concluded that there was a genuine issue of material fact as to whether Dr. Smith "exceeded his authority by misstating his actual authority." The trial court found that "the Defendants' motion for summary judgment is due to be denied on this ground." (Emphasis added.) The trial court then concluded: "In our case at bar, the issue of sovereign immunity does not need to be addressed prior to further litigation, and the case may go forward with a discussion of the issue of immunity during the course of the bench trial." In conclusion, the trial court stated: "[S]ince all issues will be heard in a bench trial, making a determination as to sovereign immunity can best be decided by hearing all of the testimony regarding the subject instead of bifurcating the issues." (Emphasis added.)
The trial court did not specifically refer to the necessity of further proceedings *490 with respect to the merits of the age-discrimination claim, the equal-protection claim, or the fraud and bad-faith count. The propriety of summary judgment as to the merits of those claims or, indeed, whether the trial court indirectly disposed of them by failing to refer to them, is not before us on this proceeding, which is limited solely to the availability of the defense of immunity.
Evidence as to the personal liability of Dr. Smith by reason of his action in excess of his authority is the sole basis for the trial court's recognition of the existence of a genuine issue of material fact as to the availability to Dr. Smith of the defense of State-agent immunity. Only count four of the amended complaint refers to action in excess of authority. However, the trial court's reference to Dr. Smith's "misstating his actual authority" could also be relevant to count three of the complaint, charging fraud and bad faith. Thus, the trial court's order can be said to sweep in favor of triable issues as to the availability of State-agent immunity as to both counts three and four. Whether the trial court's order should also be correctly interpreted as recognizing or rejecting triable issues as to immunity with respect to counts one (age discrimination) and two (equal protection) simply cannot be determined at this juncture. I am not willing to address an issue that mere speculation might suggest is properly before us. Thus, the sole issue before this Court at this stage of the proceeding coming to us by a petition for a writ of mandamus seeking enforcement of the defense of immunity is whether the trial court erred in not entering a summary judgment in favor of the defendants as to counts three and four of the amended complaint.
The controversy centers around Dr. Smith's having described his authority in a letter to the plaintiffs in terms that erroneously attributed to him greater authority than he in fact possessed. We recognize an exception to State-agent immunity "when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." See Ex parte Cranman, 792 So.2d at 405. The plaintiffs argue before us that they are entitled to the exception from immunity described as "a mistaken interpretation of the law." Respondents' brief, p. 14. However, count four of the complaint does not allege a mistaken interpretation of the law; instead, as previously noted, it charges that Dr. Smith acted beyond his authority. Confining review to that issue, in Finnell v. Pitts, 222 Ala. 290, 293, 132 So. 2, 4 (1930), this Court stated: "If in the promotion of the state's business its officers without authority of law apply private property to the state's enterprises, they are guilty of the same nature of wrong, as if they were acting as agents of a private corporation." We lose the sense of the exception if we take it beyond the context of intentional conduct, such as the taking of property as was the case in Pitts, one of the early cases in which it was recognized. See also Elmore v. Fields, 153 Ala. 345, 351, 45 So. 66, 67 (1907) ("Here, we have an agent charged with a tort [trespass], setting up by plea that he was acting for and in behalf of the state, and the authorities hold that he has no authority to act for the state in the commission of a tort."). The foundation of the trial court's denial of immunitythe inaccurate description of Dr. Smith's authoritydoes not in and of itself constitute a freestanding intentional tort to which the exception from immunity based on action beyond a State agent's authority can apply.
With respect to the allegation of fraud in count three of the amended complaint, I agree with the conclusion in the main opinion that an innocent misrepresentation *491 does not fall within an exception to State-agent immunity. Therefore, the petition for a writ of mandamus can be denied if a question of fact exists as to whether Dr. Smith acted willfully in misstating his authority. The petitioners (the defendants in the trial court) did not provide a complete record of the responses filed by the plaintiffs in opposition to their summary-judgment motion. In Ex parte Covington Pike Dodge, Inc., 904 So.2d 226, 232 n. 2 (Ala. 2004), this Court explained the role of the parties in assembling a record in a mandamus proceeding:
"The materials reviewed by this Court in considering a petition for writ of mandamus consist of exhibits provided by the parties:
"`[A] petitioner for a writ of mandamus is obliged to provide with the petition "copies of any order or opinion or parts of the record that would be essential to an understanding of the matters set forth in the petition." Rule 21(a), Ala. R.App. P. In the event the petition is not denied, the respondent is directed to file an answer to the petition, which provides the respondent with an "opportunity to supplement the `record' by attaching exhibits of its own...."'
"Ex parte Fontaine Trailer Co., 854 So.2d 71, 74 (Ala.2003) (quoting Ex parte Miltope Corp., 522 So.2d 272, 273 (Ala. 1988))."
In their answer to the petition the plaintiffs attach numerous affidavits and documents as exhibits, but they fail to attach any responses to the summary-judgment motion. Of course, such responses do exist, as some of the materials attached to the petition respond to them. The plaintiffs do not argue in their brief in opposition to the petition that there is a genuine issue of material fact as to a state of mind consistent with intentional misrepresentations on the part of Dr. Smith. Nothing in the trial court's order suggests the existence of a genuine issue of material fact as to Dr. Smith's state of mind.
I would grant the petition and order the trial court to hold further proceedings, before holding any bench trial, with respect to the defendants' motion for a summary judgment, with such proceedings to culminate in an order either entering or denying a summary judgment as to each count of the complaint and with such further proceedings to be governed by the conclusions expressed herein with respect to the absence of any impediment to State-agent immunity arising from Dr. Smith's having exceeded his authority or misstated his authority.
NOTES
[1] While this case was pending below, Dr. Gogue was substituted for Dr. Ed Richardson, the former president of Auburn University. See Rule 25(d)(1), Ala. R. Civ. P.
[2] See note 1.
[3] The plaintiffs' motion for a summary judgment and supportive briefs have not been included in the materials filed in opposition to the petitioner's petition for a writ of mandamus.
[4] The plaintiffs do not include in the argument section of their brief a description of how Dr. Smith acted fraudulently or beyond the scope of his authority so as to remove him from the protection afforded him by State-agent immunity. Instead, they simply refer to Dr. Smith's conduct as "acting under a mistaken interpretation of the law" with almost no development of this argument. Therefore, it could be assumed that the plaintiffs have abandoned their contentions on appeal as they relate to Dr. Smith's claim of State-agent immunity. However, because the trial court found that a genuine issue of material fact existed as to whether Dr. Smith had acted fraudulently and/or beyond his authority and, therefore, whether he was entitled to State-agent immunity, we will address the issue whether Dr. Smith was entitled to State-agent immunity.
[5] In June 2005, Dr. Smith responded by letter to the plaintiffs' request for an increase in their base salaries allegedly to create equity with the nine-month appointees. In that letter Dr. Smith simply stated that federal policy prohibited the plaintiffs from converting from 12-month appointments to 9-month appointments and still remain eligible for their Federal Civil Service Retirement. He did not state that federal policy prohibited the plaintiffs from supplementing their 12-month salaries through externally funded programs. Dr. Smith later testified in his deposition and affidavit that it was the University's policy that prohibited the plaintiffs from enhancing their 12-month salaries with externally funded programs.