MURDOCK, Justice.
Tonya Denson, a member of the Employees’ Retirement System of Alabama (“the ERSA”), and Venius Turner, a member of the Teachers’ Retirement System of Alabama (“the TRSA”), brought this action on behalf of themselves, individually, as well as similarly situated members of the Retirement Systems of Alabama (“the RSA”), in the Montgomery Circuit Court against (1) David Bronner, in his official capacities as chief executive officer and secretary-treasurer of the ERSA, the TRSA, and the RSA[1] and (2) the officers and members of the respective boards of *617 control of the TRSA and the ERSA, in their official capacities (Bronner and the officers and members of the boards of control are hereinafter referred to collectively as “the RSA defendants”).
The RSA defendants filed a motion to dismiss the complaint, which the trial court denied. The RSA defendants then filed a petition for a writ of mandamus with this Court, asking that we direct the trial court to vacate its order denying their motion to dismiss and to grant the motion. We grant the petition.
/. Facts and Procedural History
The RSA includes the TRSA, which is administered for the benefit of public-education employees who are members of the TRSA, and the ERSA, which is administered for the benefit of state employees who are members of the ERSA. See supra note 1. Denson is a member of the ERSA; Turner is a member of the TRSA. The board of control of the TRSA is charged by statute with making and overseeing investments on behalf of the TRSA, just as the board of control of the ERSA is tasked with the same responsibility and authority as to the ERSA. See Ala.Code 1975, § 16-25-2(b) and § 36-27-2(b).
Section 16-25-20, Ala.Code 1975, provides:
“(a)(1) The Board of Control [of the TRSA] shall be the trustees of the several funds of the Teachers’ Retirement System created by this chapter as provided in Section 16-25-21, and shall have full power to invest and reinvest the funds, through its Secretary-Treasurer, in the classes of bonds, mortgages, common and preferred stocks, shares of investment companies or mutual funds, or other investments as the Board of Control may approve, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with the matters would use in the conduct of an enterprise of a like character and with like aims; and, subject to like terms, conditions, limitations, and restrictions, the Board of Control, through its Secretary-Treasurer, shall have full power to hold, purchase, sell, assign, transfer, and dispose of any investments in which the funds created herein shall have been invested, as well as the proceeds of the investments and any moneys belonging to the funds.
“(2) The Secretary-Treasurer shall have the authority and it shall be his or her duty to carry out the investment policies fixed by the Board of Control, and pursuant thereto he or she shall examine all offers of investments made to the funds, shall initiate inquiries as to available investments therefor, shall review periodically the investment quality and desirability of retention of investments held, and shall make purchases and sales of investments as he or she shall deem to the best interests of the funds and as the investment committee hereinafter provided for, and as the consultant to the Secretary-Treasurer, if any, appointed by the Board of Control hereunder, to the extent of the purpose for which it is appointed, shall approve ....
“(3) The Board of Control shall elect an investment committee which shall consist of three members of the board, one of whom shall be the Director of Finance. The investment committee shall act as agent for the board and shall consider all investment recommendations made by the Secretary-Treasurer and shall either approve or disapprove the same in accordance with policies set by the board....
“(4) The Board of Control may appoint and employ as consultant to the Secretary-Treasurer, in the purchase, sale, and review of investments of the funds, to the extent the board may des *618 ignate, a bank having its principal office in the State of Alabama, having capital, surplus, and undivided profits of not less than three hundred million dollars ($300,000,000), and having an organized investment department.”
See also Ala.Code 1975, § 36-27-25(a), (c), (d), and (e) (substantially similar provisions as to the board of control of the ERSA).[2]
In their complaint, the plaintiffs alleged that the RSA defendants had violated their fiduciary duties. Quoting Ala.Code 1975, § 16-25-20(a)(1), governing the TRSA, and citing § 36-27-25(a), governing the ERSA and which, in all material respects, is identical to § 16-25-20(a)(1), the plaintiffs alleged that the RSA defendants are obligated to invest the respective retirement funds being managed by them “ ‘with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with the matters would use in the conduct of an enterprise of a like character and with like aims.’ ”
The plaintiffs also alleged that the RSA has adopted a policy statement entitled “Investment Policies and Procedures” that states, in part, as follows:
“The Boards of Control, as Trustees of the Teachers’ Retirement System and Employees’ Retirement System (Systems), have full power, through each System’s secretary-treasurer, to invest and reinvest System funds in accordance with the Prudent Man Rule: “with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.’ Other funds currently and hereafter under the management of the Systems will be governed by this Investment Policy Statement within each System’s limitations and/or by other applicable legislated restrictions.
“It is the objective of the Boards [of Control of the TRSA and the ERSA] that funds be invested in such a manner as to maximize the total return of each System within prudent risk parameters. Also, the Systems recognize that a stronger Alabama equates to a stronger Retirement System, and as such, investments in Alabama businesses are encouraged to the extent the investment meets the criteria delineated by this policy statement.”[3]
The plaintiffs alleged that, “for as much as the most recent fifteen year period,” the RSA defendants have made investments
*619 “in Alabama golf courses, office buildings, condominiums, hotels, resorts and stock and debt holdings in companies conducting business in Alabama (collectively referred to as ‘Alabama Investments’), which investments have historically yielded lower returns than investments which could or should have been made in compliance with the mandates of the law, the Prudent Man Rule, the Investment Policy of the RSA, and its Mission Statement.”
(Emphasis added.) In this regard, the plaintiffs contended that “up to ... approximately 15%” of the investments made by the boards of control have been in such Alabama-based investments. They contend that the ERSA and the TRSA received lower returns on those investments than could have been realized on other investments, which, in turn, made it necessary for members of the ERSA and the TRSA and the State of Alabama to pay more to enable the ERSA and the TRSA to meet their obligations to retirees. They alleged that, “though the Alabama Investments may have been well intended, and may serve as a vehicle for creating goodwill, they have not been made in compliance with the Prudent Man Rule.”
The plaintiffs asked the trial court to enter a judgment declaring
“that the duties of the [RSA] Defendants, separately and severally, are specifically subject to the statutory provisions, mandates and restrictions specified in § 36-27-25 and § 16-25-20, Code of Alabama, and that any deviation from those provisions, mandates and restrictions [is] unlawful”
and declaring further that it is “beyond the authority” of the boards of control to invest “any assets and funds ... in Alabama Investments which the [RSA defendants] expected or were aware would yield less of a return than alternative or other investments.” Similarly, the plaintiffs requested in their complaint that the trial court enjoin the RSA defendants from, among other things, investing “any assets” within their control in a manner not in accord with the “Prudent Man Rule” and from investing “in Adabama Investments ... which the [RSA defendants] expect or are aware will yield less of a return than alternative or other investments.”
The RSA defendants filed a motion to dismiss the complaint. The motion, as initially filed, asserted two grounds for dismissal of the complaint. First, the RSA defendants asserted that State, or sovereign, immunity precluded prosecution of the claims. See Art. I, § 14, Ala. Const. 1901; Ala.Code 1975, §§ 16-25-2(b) and 36-27-2(b) (recognizing that the boards of control of the TRSA and the ERSA are instrumentalities of the State, that the TRSA and the ERSA are funded by the State, and that their officers and employees are immune from suit in their official capacities to the same extent as the State, its agencies, and its officers and employees). According to the RSA defendants, the plaintiffs’ claims do not fall within any of the recognized “exceptions” to State immunity applicable to State officials. Second, the RSA defendants asserted that Denson and Turner lacked standing.[4] ■
*620 Denson and Turner filed a reply in opposition to the motion to dismiss, contending that the plaintiffs’ claims did in fact fall within recognized “exceptions” to State immunity. They also contended that they had standing, relying principally on a 1981 decision of this Court, Lee v. Bronner, 404 So.2d 627 (Ala.1981).
The RSA defendants filed a response to Denson and Turner’s reply in opposition, adding arguments that the plaintiffs’ claims were nonjusticiable and that Den-son and Turner had failed to exhaust administrative remedies.
In December 2011, the trial court denied the motion to dismiss. The RSA defendants filed a timely petition for the writ of mandamus with this Court.

II. Standard of Review

A writ of mandamus is an “ ‘extraordinary writ that will be issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court.’ ”
Ex parte Wood, 852 So.2d 705, 708 (Ala. 2002) (quoting Ex parte United Serv. Stations, Inc., 628 So.2d 501, 503 (Ala.1993)). “ “When we consider a mandamus petition, the scope of our review is to determine whether the trial court clearly exceeded its discretion.’ ” Ex parte Thomas, 110 So.3d 363, 365-66 (Ala.2012) (quoting State v. Bui 888 So.2d 1227, 1229 (Ala.2004)).
“Subject to certain narrow exceptions ..., we have held that, because an ‘adequate remedy’ exists by way of an appeal, the denial of a motion to dismiss ... is not reviewable by petition for writ of mandamus.” Ex parte Liberty Nat’l Life Ins. Co., 825 So.2d 758, 761-62 (Ala.2002). One of the recognized exceptions to this general rule is “that mandamus will lie to compel the dismissal of claim that is barred by the doctrine of sovereign immunity.” Ex parte Blankenship, 893, So.2d 303, 305 (Ala.2004). Likewise, the writ may be issued where the plaintiffs claims fail to present a justiciable controversy. Gulf Beach Hotel, Inc. v. State ex rel. Whetstone, 935 So.2d 1177, 1182 (Ala.2006).

III. Analysis

The RSA defendants argue that they are entitled to immunity as to the plaintiffs’ claims, that Denson and Turner lack standing because they “cannot allege an injury in fact,” that the controversy at issue is nonjusticiable, and that Denson and Turner have failed to exhaust administrative remedies. In response to those arguments, the trial court identified a number of issues that gave it “considerable concern”:
“The issues presented on motion to dismiss are significant ones, several of which causé the court considerable concern. These issues include whether Plaintiffs have standing; whether [the RSA] Defendants are entitled to state sovereign immunity; whether a Prudent Man Rule applies and the parameters of a Prudent Man Rule, if one applies; whether the Boards of Control, as fiduciaries, have discretion to consider any factor other than obtaining the highest rate of return; whether and how the court might substitute its judgment for the judgment of the Boards of Control, since investment policymaking is a function allotted by the legislature to the Boards of Control; whether the court can take the responsibility for investment policymaking from the Boards of Control when Plaintiffs have the political remedy of electing new and different members to the Boards of Control; and whether Plaintiffs are required to exhaust the available administrative remedy. These issues should be presented to the court on a motion for summary judg- *621 merit with supporting materials and law.”
The issues that gave the trial court concern also give this Court concern. Unlike the trial court, however, we conclude that some of those issues are appropriate for consideration at this juncture in the litigation. In this regard, we turn first to the corollary questions of sovereign immunity and separation of powers.[5]
Section 14 of the Alabama Constitution of 1901 provides: “[T]he State of Alabama shall never be made a defendant in any court of law or equity.” As discussed below, the doctrine of sovereign immunity not only prohibits the State itself from being named as a defendant in an action, but it also prohibits State agencies and, as a general rule, State officials sued in their official capacity from being named as defendants in an action. As discussed further below, the bar of sovereign immunity aligns with and is buttressed by the doctrine of separation of powers to the extent the latter prohibits the judicial branch, through adjudications, from usurping functions dedicated to the executive and legislative branches. See Art. Ill, § 43, Ala. Const.1901.[6]
It has long been held that the wall of sovereign immunity erected by § 14 of the Alabama Constitution is.formidable:
“The wall of immunity erected by § 14 is nearly impregnable. Sanders Lead Co. v. Levine, 370 F.Supp. 1115, 1117 (M.D.Ala.1973); Taylor v. Troy State Univ., 437 So.2d 472, 474 (Ala. 1983); Hutchinson v. Board of Trustees of Univ. of Alabama, 288 Ala. 20, 24, 256 So.2d 281, 284 (1971). This immunity may not be waived. Larkins v. Department of Mental Health & Mental Retardation, 806 So.2d 358, 363 (Ala. 2001)(‘The State is immune from suit, and its immunity cannot be waived by the Legislature or by any other State authority.’); Druid City Hosp. Bd. v. Epperson, 378 So.2d 696 (Ala.1979) (same); Opinion of the Justices No. 69, 247 Ala. 195, 23 So.2d 505 (1945) (same); see also Dunn Constr. Co. v. State Bd. of Adjustment, 234 Ala. 372, 175 So. 383 (1937). ‘This means not only that the state itself may not be sued, but that *622 this cannot be indirectly accomplished by suing its officers or agents in their official capacity, when a result favorable to plaintiff would be directly to affect the financial status of the state treasury.’ State Docks Comm’n v. Barnes, 225 Ala. 403, 405, 143 So. 581, 582 (1932) ...; see also Southall,v. Stricos Corp., 275 Ala. 156, 153 So.2d 234 (1963).”
Patterson v. Gladwin Corp., 835 So.2d 137, 142 (Ala.2002) (emphasis omitted).
It is not merely when an action against a State official would “affect the financial status of the state treasury,” however, that such an action is barred by § 14. This Court has long recognized that actions against State officials sued in their official capacity are barred by § 14 unless they fall within certain categories of actions that, as a rule, do not involve discretionary decision-making by those officials. As early as 1971, this Court recognized that those categories included:
“(1) Actions brought to compel State officials to perform their legal duties. Department of Industrial Relations v. West Boylston Manufacturing Co., 253 Ala. 67, 42 So.2d 787 [ (1949) ]; Metcalf v. Department of Industrial Relations, 245 Ala. 299, 16 So.2d 787 [ (1944) ]. (2) Actions brought to enjoin State officials from enforcing an unconstitutional law. Glass v. Prudential Insurance Co. of America, 246 Ala. 579, 22 So.2d 13 [ (1945) ].... (3) Actions to compel State officials to perform ministerial acts. Curry v. Woodstock Slag Corp., 242 Ala. 379, 6 So.2d 479 [ (1943) ], and cases there cited. (4) Actions brought under the Declaratory Judgments Act, [now Ala.Code 1975, § 6-6-220 et seq.], seeking construction of a statute and how it should be applied in a given situation.”
Aland v. Graham, 287 Ala. 226, 229-30, 250 So.2d 677, 679 (1971).
To the four categories of action identified in Aland, ■ this Court has since added and repeatedly recognized two additional categories of action against State officials that do not seek to invade the exercise of discretion delegated to them by State law and, therefore, do not qualify as “actions against the State” for purposes of § 14 immunity:
“ ““ “(5) valid inverse condemnation actions brought against State officials in their representative capacity. and
“ ‘(6)[ ] actions for injunction brought against State officials in their representative capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law.... ’ ”
Ex parte Jackson Cnty. Bd. of Educ., 164 So.3d 532, 536 (Ala.2014) (quoting Ex parte Moulton, 116 So.3d 1119, 1131 and 1141 (Ala.2013), quoting in turn other cases).[7]
Turning then to the present ease, the gravamen of the plaintiffs’ complaint is this: “Up to ... approximately 15%” of the investments made by the boards of control have been made in Alabama-based assets and, as a group, those investments have not yielded as much return to the ERSA and the TRSA as other investments *623 that could have been made by the RSA defendants. As a consequence, the plaintiffs contend, the investments pursued by the RSA defendants reflects a violation of a “legal duty” imposed upon them by State law and therefore those investments are “beyond the [lawful] authority” of the RSA defendants.[8]
The RSA defendants argue as follows in their initial brief to this Court:
“By adopting — and when implementing — the part of RSA’s investment policy challenged by Plaintiffs, [the RSA] Defendants made discretionary decisions that RSA members would be benefitted indirectly through limited prudent Alabama investments, which could increase the revenues of the funding sources for RSA, i.e., strengthen the State and the counties and cities and other governmental entities that participate in RSA. [The RSA] Defendants’ investment policy recognizes (1) that whether RSA members’ benefits are secure depends on the ability of the State of Alabama to pay; (2) that the ability of the State of Alabama to pay depends on its tax base; and (3) that the State of Alabama’s tax base depends on the financial strength of the State.
“Plaintiffs’ action asks the circuit court to substitute its judgment for [the RSA] Defendants’ judgment and declare that whether an investment strengthens Alabama should not be a factor that [the RSA] Defendants may consider when RSA chooses investments. Indeed, by focusing on maximizing rates of return, Plaintiffs seem to assert that the only factor [the RSA] Defendants (as fiduciaries) are permitted to consider is maximizing rates of return (which in turn implies that RSA can only have investments with predictable returns, such as CDs and bonds).”
The parties acknowledge that certain Code provisions relating to trusts may shed light on the duties of the RSA defendants under the statutes at issue in this case. The plaintiffs point to, and the RSA defendants acknowledge, the general principle of trust law requiring trustees to “administer the trust solely in the interests of the beneficiaries.” Ala.Code 1975, § 19-3B-802(a).[9] Similarly, both sides acknowledge Alabama’s codification for application to trusts generally of the so-called “prudent-investor rule,” including § 19-3B-902(c), Ala.Code 1975 (part of Alabama’s version of the Uniform Trust Act). Section 19-3B-902(c) provides:
“Among circumstances that a trustee may consider in investing and managing trust assets are such of the following as are relevant to the trust or its beneficiaries:
*624 “(1) general economic conditions;
“(2) the possible effect of inflation or deflation;
“(3) the expected tax consequences of investment decisions or strategies;
“(4) the role that each investment or course of action plays within the overall trust portfolio, which may include financial assets, interests in closely held enterprises, tangible and intangible personal property, and real property;
“(5) the expected total return from income and the appreciation of capital;
“(6) other resources of the benefi- ■ ciaries;
“(7) needs for liquidity, regularity of income, and preservation or appreciation of capital;
“(8) an asset’s special relationship or special value, if any, to the purposes of the trust or to one or more of the beneficiaries;
“(9) the size of the portfolio; and
“(10) the purposes and estimated duration of the trust.” ■
The RSA defendants, however, reject the notion that those general principles of trust law require emphasis upon rate of return to the exclusion of other factors. Indeed, as indicated, § 19-3B-902(c) expressly contemplates investment decisions that take into consideration “the role that each investment ... plays within the overall trust portfolio” (which may include not just stocks, bonds, and other financial instruments, but also “interests in closely held enterprises, tangible and intangible personal property, and real property”); “the expected total return from income and the appreciation of capital”; “other resources of the beneficiaries”; the “need[ ] for ... preservation or appreciation of capital”; “an asset’s special relationship or special value, if any, to the purposes of the trust or to one or more of the beneficiaries”; “the size of the portfolio”; and “the purposes and estimated duration of the trust.”
The RSA defendants likewise take note of caselaw that explains that the traditional “prudent-investor rule,” as applied in the context of a conventional trust agreement, allows for competing obligations— such as preserving the trust corpus, diversifying investments, avoiding unnecessary risks and volatility, and planning for tax consequences — to be taken into consideration. See, e.g., Withers v. Teachers’ Ret. Sys. of City of New York, 447 F.Supp. 1248, 1258 (S.D.N.Y.1978), aff'd, 595 F.2d 1210 (2d Cir.1979) (table) (“In the area of investment decisions, the obligation to exercise prudence is essentially an obligation to give primacy to the preservation of the trust estate and the procurement of a reasonable income while avoiding undue investment risks, see e.g., King v. Talbot, [40 N.Y. 76] at 86 [ (1869) ]; In re Mendleson’s Will, 46 Misc.2d 960, 261 N.Y.S.2d 525, 534 (Surrogate’s Ct.1965).”). As has been aptly stated:
“The record of any individual investment is not to be viewed exclusively, of course, as though it were in its own water-tight compartment, since to some extent individual investment decisions may properly be affected by considerations of the performance of the fund as an entity, as in the instance, for example, of individual security decisions based in part on considerations of diversification of the fund or of capital transactions to achieve sound tax planning for the fund as a whole.”
In re Bank of New York, 35 N.Y.2d 512, 517, 323 N.E.2d 700, 703, 364 N.Y.S.2d 164, 168 (1974).
The RSA defendants further emphasize that the question of the authority and responsibility of the boards of control is a function of a specific statutory scheme adopted by our legislature with respect to *625 the ERSA and the TRSA. In § 16-25-19 as to the TRSA and in § 36-27-23 as to the ERSA, the legislature delegated to the applicable board of control “[t]he general administration and responsibility for the proper operation of the retirement system and for making effective the provisions of’ the Code applicable to the ERSA and the TRSA. (Emphasis added.) More specifically, under § 16 — 25—20(a)(1) and § 36-27-25(a) (with minor wording variations), the legislature has provided that the boards of control for the TRSA and the ERSA “shall have full power to invest and reinvest the funds ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with the matters would use in the conduct of an enterprise of a like character and with like aims.”
Obviously, there is no single investment strategy that alone can be said to satisfy the responsibility and authority that has been delegated to the boards of control under those statutory provisions. Instead, the legislature unquestionably has delegated to the boards of control discretion in assessing what overall strategies, and what specific investments, will best serve the “aims” and “character” of the ERSA and the TRSA given the nature of the “enterprise” at issue. See, e.g., Withers, supra (recognizing an express statutory authorization of the challenged actions of public-pension fiduciaries, but also holding that the prudent-investor rule did not prevent those fiduciaries from considering possible bankruptcy of the city that contributed to the pension plan if the pension plan did not purchase the city’s municipal bonds).
Ultimately, in fact, the plaintiffs concede that the RSA defendants may “legally consider factors other than rate-of-return.” In this regard, the plaintiffs do not contend that the investment strategies and decisions of the boards of control are not “discretionary” in nature. The plaintiffs contend only that the discretion that has been delegated to the boards of control by our legislature is not “unfettered.” This, however, is a proposition with which the RSA defendants do not disagree.
More specifically, the plaintiffs contend that the discretion afforded the boards of control is constrained by a fiduciary obligation to administer the ERSA and the TRSA solely in the interest of the members of the ERSA and the TRSA and, as prescribed in §§ 16 — 25—20(a)(1) and 36-27-25(a), to invest with the “care, skill, prudence, and diligence under the circumstances then prevailing” that a “prudent man” acting in a “like capacity” would use in the conduct of “an enterprise of a like character” and “with like aims.” The RSA defendants do not disagree with this proposition either.
The difference in the positions of the plaintiffs and the RSA defendants is that the plaintiffs would have the courts assume responsibility for examining what the fulfillment of the aforesaid statutory responsibilities should look like. For this or any court to be able to engage in such an examination as it relates to State officials, however, as opposed to private trustees, we must first surmount the wall of sovereign immunity that protects executive action from interference by the judiciary.
We cannot conclude, however, that, by asking the courts to enforce the general statutory obligations of the nature described above, the plaintiffs have sought enforcement of a “legal duty” of the nature contemplated by the first “exception” or category recognized in Aland. The “prudent-man rule” is, by its essential nature, a standard that allows for the exercise of ample discretion. It may provide general, guiding principles against which a court could assess a claim of personal liability or *626 perhaps removal of a private trustee accused of making imprudent investment decisions, but it does not advance a specific duty that can serve as a basis for an order by the judicial branch to the executive branch to take certain action going forward. Compare, e.g., the “legal duty” cases cited in Aland: Department of Indus. Relations v. West Boylston Mfg. Co., 253 Ala. 67, 42 So.2d 787 (1949) (ordering refund to an employer of specific contributions made to the State’s unemployment-compensation fund pursuant to a statute providing for such refunds), and Metcalf v. Department of Indus. Relations, 245 Ala. 299, 16 So.2d 787 (1944) (requiring the Director of Industrial Relations to collect no more than the statutorily prescribed amount pursuant to the unemployment-compensation contribution rate applicable to a given employer). Put differently, the general duty to invest prudently and in the best interests of plan participants, taking into consideration a variety of competing concerns, provides no more basis for surmounting the wall of sovereign immunity than would, for example, the general rule that the director of any executive agency should prudently administer assigned resources and employees. If such a director is performing the task of administering the applicable agency, poor decision-making does not of itself give cause for legal action that is not subject to the doctrine of sovereign immunity.[10]
By the same token, we do not have here a case that satisfies the “beyond authority” exception to sovereign immunity identified above. The boards of control have statutory authority to invest the assets of the ERSA and the TRSA. They are doing that. The fact that they might not do that in accordance with the legal standard to which they would be held liable if they could be sued does not mean that they can in fact be sued.
The standard for liability and the standard for overcoming the bar of sovereign immunity are two different things. Thus, one might question whether a State official has acted with sufficient care or prudence in his or her decision-making, but imprudence or lack of care has never, *627 of itself, been a basis for overcoming the bar of sovereign immunity. Were it otherwise, the protection afforded State officials in their making of discretionary decisions would cease to exist. The “nearly impregnable” wall of immunity would be collapsed into the bare question of liability itself, e.g., whether a State official can be adjudged to have acted negligently, or merely unwisely. And the efficient and effective functioning of the executive branch free of the “hamstringing” effect of second-guessing by the judicial branch would be put at risk accordingly. Cf. Ex parte Cranman, 792 So.2d 392, 400-01 (Ala.2000) (plurality opinion) (explaining the correlation between § 14 immunity and the separation of powers required by § 43 and that “the vulnerability of State agents to suit, if not constrained, could lead to excessive judicial interference in the affairs of coequal branches of government, contrary to § 43”).
Finally, even if we could overcome the bar of sovereign immunity in order to rule in favor of the plaintiffs on the issue of liability, it is not within the subject-matter jurisdiction of the courts to grant the relief requested here. Specifically, granting the remedy sought by the plaintiffs in this case would run afoul of the constitutionally mandated principle of separation of powers, a principle that not only is an underpinning of the doctrine of sovereign immunity, but also provides an independent basis for concluding that the trial court lacks subject-matter jurisdiction to act as requested in this case.
This is not a private-trust case in which the plaintiffs seek a divestiture of a particular investment, monetary damages to compensate for a specific investment decision, or even to remove a trustee from his or her post. Instead, the essential relief requested by the plaintiffs in this case is a permanent injunction to be enforced by the court into the indefinite future that would purport to require the boards of control to do two things going forward:
1. Follow “the prudent-man rule” and
2. Refrain from investing in any Alabama-based investment that “the [RSA] Defendants expect or are aware will yield less of a return than alternative or other investments.”
The latter form of relief is not an accurate statement of the “prudent-man rule” invoked in the former form of relief and, in fact, conflicts with it. The “prudent-man rule,” or the “prudent-investor rule,” itself, as discussed above, not only allows, but in fact requires, a trustee to take into consideration many factors other than the direct and immediate rates of return. As discussed above, those factors include, but are not limited to, general economic conditions, the effects of inflation or deflation, the need for diversification and the role each investment plays within the overall trust portfolio, the need for liquidity, the need for regularity of income, preservation or appreciation of capital, an asset’s special relationship or special value to the purposes of the trust, the size of the portfolio, and the purposes and estimated duration of the trust. Furthermore, investments may include real property as well as tangible or intangible personal property.
Considering the first form of relief noted above, what the plaintiffs seek is merely a reiteration in a court order of what is already the statutorily prescribed standard applicable to the investment decisions of the boards of control. To simply order the RSA defendants to follow this statutorily prescribed “prudent-man rule” would provide the boards of control with no specific guidance as to how to exercise the discretionary authority invested in them under that rule. What it would do, however, is put the courts in the position of analyzing and overseeing the decisions of the boards of control on a continual and ongoing basis *628 because any such order must of course be enforced by the courts in the years to come. It would put the courts in a position analogous in some ways to the position assumed by the federal courts in overseeing Alabama’s mental-health system for several decades. See Wyatt ex rel. Rawlins v. Sawyer, 219 F.R.D. 529 (M.D.Ala. 2004). Unlike the federal courts acting in relation to the State of Alabama, however, Alabama courts are restricted by the doctrine of separation of powers in relation to their coequal branches of government.
In what came to be known as the “equity-funding case,” this Court, in Ex parte James, .836 So.2d 813 (Ala.2002), stepped back from the brink of usurping the authority of a coordinate branch of our government to make decisions as to how, to what extent, and to what ends to fund our public schools. Although the Court acknowledged serious concerns as to the propriety of its previous judgment of liability, it ultimately found it unnecessary to resolve those concerns and, instead, “retreated” from its earlier judgment on the alternative ground that the remedy that it was being asked to order, and that it would be required to administer for years to come, would have put the Court on a collision course with § 43 of the Alabama Constitution. As the Court explained in Ex parte James:
“This Court ‘shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.’ Ala. Const.1901, § 43 (emphasis added). In Alabama, separation of powers is not merely an implicit ‘doctrine’ but rather an express command; a command stated with a forcefulness rivaled by few, if any, similar provisions in constitutions of other sovereigns.... Compelled by the weight of this command and a concern for judicial restraint, we hold (1) that this Court’s review of the merits of the still pending eases commonly and collectively known in this State, and hereinafter referred to, as the ‘Equity Funding Case,’ has reached its end, and (2) that, because the duty to fund Alabama’s public schools is a duty that — for over 125 years — the people of this State have rested squarely upon the shoulders of the Legislature, it is the Legislature, not the courts, from which any further redress should be sought. Accordingly, we hold that the Equity Funding Case is due to be dismissed.
[[Image here]]
“... [T]he issue of the proper remedy in this case raises concerns for judicial restraint .... With regard to the remedy, our concern is ... that the pronouncement of a specific remedy ‘from the bench’ would necessarily represent an exercise of the power of that branch of government charged by the people of the State of Alabama with the sole duty to administer state funds to public schools: the Alabama Legislature. As Justice Houston noted in Ex parte James [, 713 So.2d 869 (Ala.1997), a previous opinion in the Equity Funding Case]:
“ ‘Circumstances have denied this Court the opportunity to review the trial court’s liability order. Even so, it is the duty of the Judicial Department of Alabama government only to determine what the Constitution of Alabama requires.. In my opinion, the Legislative Department and the Executive Department, and not the Judicial Department, have the power and duty to implement a plan that would make this system equitable.... I trust that the Legislative Department and the Executive Department will proceed to exercise the power and perform the duty they have been called upon to exercise and perform to make Alabama’s public educational system constitutional. The “Separation of Pow *629 ers” provision of the Constitution of Alabama of 1901 (Art. Ill, § 43) prohibits me from doing more, without resorting to unconstitutional judicial activism, which I have heretofore avoided.’
“713 So.2d at 895 ... (Houston, J., concurring in the result in part and dissenting in part).
“... In & parte James, the Court recognized the serious difficulties implicated by judicial involvement in the administrative details of school funding. 713 So.2d at 880-82....
[[Image here]]
“Our conclusion that the time has come to return the Equity Funding Case in toto to its proper forum seems a proper and inevitable end, foreshadowed not only by the obvious impracticalities of judicial oversight, but also by the Court’s own actions in Ex parte James. While the plurality in Ex parte James opined that, in the abstract, the judiciary had the authority to implement a remedy, it did not attempt this task (which may have proven illustrative, because its concrete, rather than abstract, form would have proven its legislative nature) and instead admitted that ‘the legislature ... bears the “primary responsibility” for devising a constitutionally valid public school system.’ Id. at 882 (quoting McDuffy v. Secretary of the Exec. Office of Educ., 415 Mass. 545, 619 n. 92, 615 N.E.2d 516, 554 n. 92 (1993) (quoting Edgewood Indep. School Dist. v. Kirby, 777 S.W.2d 391, 399 (Tex. 1989)))....
“Continuing the descent from the abstract to the concrete, we now recognize that any specific remedy that the judiciary could impose would, in order to be effective, necessarily involve a usurpation of that power entrusted exclusively to the Legislature. Accordingly, compelled by the authorities discussed above — primarily by our duty under § 43 of the Alabama Constitution of 1901 — we complete our judicially prudent retreat from this province of the legislative branch in order that we may remain obedient to the command of the people of the State of Alabama that we ‘never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.’ Ala. Const.1901, § 43 (emphasis added).”
836 So.2d at 815-19 (some emphasis in original, some emphasis added, and some emphasis omitted; footnotes omitted).
By the same token, the complex task of continually analyzing, comparing, and choosing from among the myriad of different investment vehicles available in today’s sophisticated investment world is a task delegated by the legislature to the executive branch and to the boards of control in particular. The plaintiffs ask us nonetheless to assume going forward the ongoing responsibility of overseeing the decisions of the boards of control and evaluating the extent of their compliance with the “prudent-man rule.” To send this case back to the trial court for further examination of this request would be to contemplate that the trial court, in order to enforce a permanent declaratory and injunctive order of the nature requested, could engage in an ongoing, in-depth factual inquiry into the advantages and disadvantages of various Alabama-based investment strategies the boards may consider from time to time and compare those strategies to the various advantages and disadvantages of all other alternative investment opportunities available to the boards, weighing in the process all relevant factors, including rates of return, volatility, security, diversification, general economic conditions, the effects of inflation or deflation, the role each investment would play within the overall trust portfolio, the need for liquidity, the need for regularity of income, and preservation *630 or appreciation of capital. The type of continual oversight and analysis that would be required of this Court to assess compliance with permanent orders of the type sought by the plaintiffs highlights the fact that this is not a task for which the courts of this State are suited and is not a task that has been delegated to them. Instead, as was true in the equity-funding case, the remedy for any deficiency in the investment strategies pursued by the boards of control lies elsewhere. One possible remedy would be recourse to the ballot box for the election of different State officials who either serve on, or appoint some of the members of, the boards of control. See §§ 16-25-19(b) and 36-27-2300, Ala.Code 1975. More likely, it might mean an even more direct political recourse in the form of an exercise of the “political power” specifically delegated by the legislature to ERSA and TRSA members themselves, who by statute are directly empowered to elect most of the members of each board of control. Id. We cannot conclude that it means the assumption by the courts of the continuing oversight of the investment decisions made by the boards of control in response to the actions alleged in this case.

IV. Conclusion

The legislature has delegated broad authority to the boards of control; it has vested in those boards flexibility and discretion to be exercised in the context of the “character” of the “enterprise” at issue and its “aims.” The doctrines of sovereign immunity and separation of powers require that the judicial branch honor that delegation and not take upon itself the task of reviewing the investment strategies and decisions of the boards of control, at least not under the circumstances presented here.[11]
This Court has long recognized through adherence to the principle of separation of powers and the political-question doctrine “ ‘the impossibility of a court’s undertaking independent resolution’ ” of every dispute affecting the operation of • State government “ ‘without expressing lack of the respect due coordinate branches of government.’ ” Birmingham-Jefferson Civic Ctr. Auth. v. City of Birmingham, 912 So.2d 204, 215 (Ala.2005) (quoting Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). For that matter, any oversight by this Court of investment choices made by the boards of control would be a task for which this and other courts are not equipped. The “[l]ack of judicially discoverable and manageable standards” supports the conclusion that the making and oversight of such choices has been, and should be, left to a branch of government other than the judicial. Id. at 218.
Although the ultimate question decided in Cranman regarded so-called State-agent immunity, that Court directly addressed the nature of the protection afforded by §§ 14 and 43 of the Constitution in a manner that is apposite here:
“[W]e cannot ignore the strong policy against judicial interference in the affairs of State government as articulated in § 14 and mandated by § 43. Al *631 though § 14 is, by its terms, restricted to prohibiting lawsuits against the State, we cannot disregard its impact upon our obligation to observe the constitutional separation of powers.”
Ex parte Cranman, 792 So.2d at 401. “[Section] 14 [is] an expression of a strong public policy against the intrusion of the judiciary into the management of the State....” Id.
Based on the foregoing, we grant the RSA defendants’ petition and issue the writ. We direct the trial court to vacate its order refusing to dismiss the complaint and to grant the RSA defendants’ motion to dismiss.
PETITION GRANTED; WRIT ISSUED.
STUART, PARKER, and WISE, JJ., concur.
BOLIN and BRYAN, JJ., concur in the result.
MOORE, C.J., and SHAW, J., dissent. MAIN, J., recuses himself.

. The ERSA and the TRSA are part of the RSA. See Ala.Code 1975, § 16-25-22(a) and § 36-27-3.

. A regulation governing the ERSA provides, in part, as follows:
"(1) The fiduciary standards of staff and Board of Control members [are] to be of the highest degree.
"(a) All investments are to be made within the ‘prudent man’ concept of fiduciary trusteeship;
"(b) The fiduciary standards are governed by any federal law, Securities and Exchange Commission rulings, and general laws of the State of Alabama, in addition to any specific rulings of the Alabama Ethics Commission such as 'Advisory Opinion No. 230.' ”
Ala. Admin. Code (RSA), Rule 800-2-3-.09. No comparable regulation exists as to the TRSA. The plaintiffs do not rely upon the above-quoted regulation in their complaint, and no party addressed it in the briefs to the trial court or addresses it in the briefs to this Court. As discussed infra, a version of the " ‘prudent man' concept” is embodied in § 16-25-20 and § 36-27-25, which are applicable to the TRSA and the ERSA, respectively.

. In addition, the plaintiffs alleged that the RSA has adopted the following mission statement: “The mission of the Retirement Systems of Alabama is to serve the interests of our members by preserving the excellent benefits and soundness of the Systems at the least expense to the State of Alabama and all Alabama taxpayers.”

. The RSA defendants also asserted that the plaintiffs had failed to allege a cognizable claim based on violations of the “prudent-man rule.” As this Court noted in American Suzuki Motor Corp. v. Burns, 81 So.3d 320, 321 (Ala.2011), however, the denial of a motion to dismiss for failure to state a claim upon which relief can be granted generally is not subject to appellate review unless this Court has granted permission to appeal pursuant to Rule 5, Ala. R.App. P. The RSA defendants did not seek permission to appeal pursuant to Rule 5, Ala. R.App. P., and they have not argued the failure-to-state-a-claim issue in their petition. Thus, we will not address that issue.

. The appropriateness of our review of these issues at this juncture is a function of the legal nature of the questions presented, as well as the fact that these issues go to the subject-matter jurisdiction of the trial court. We also note that sovereign immunity is a defense that protects the State and its officials not only from liability, but also from suit. See, e.g., Burgoon v. Alabama State Dep’t of Human Res., 835 So.2d 131, 133 (Ala.2002) ("A trial court must dismiss an action against a State agency or against a State agent acting in an official capacity at the earliest opportunity.”); Ex parte Auburn Univ., 6 So.3d 478, 484 (Ala.2008) (applying to a defense of sovereign immunity the federal qualified-immunity principle that " '[t]he privilege is "an immunity from suit rather than a mere defense to liability”’” (quoting Ryan v. Hayes, 831 So.2d 21, 31 (Ala.2002), quoting in turn Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001))).

. Section 43, Ala. Const.1901, states:
"In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.”
See also Ex parte Cranman, 792 So.2d 392, 399 (Ala.2000) (plurality opinion) (citing Mitchell v. Forsyth, 472 U.S. 511, 521, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), for the proposition that the doctrine of sovereign immunity has "footings” in the doctrine of separation of powers).

. In Ex parte Jaclcson County Board of Education we also noted that actions for monetary damages against State officials " 'in their individual capacity' ” are not properly deemed actions against the State " 'where it is alleged that [the State officials] had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law.' ” 164 So.3d at 536 (quoting Ex parte Moulton, 116 So.3d at 1141). We take this opportunity to clarify that any action against a State official that seeks only to recover monetary damages against the official "in [his or her] individual capacity" is, of course, not an action against that person in his or her official capacity and would of necessity fail to qualify as "an action against the State” for purposes of § 14.

. The plaintiffs also seek to maintain this action under the "exception” to sovereign immunity recognized for actions brought against State officials under the Declaratory Judgments Act, seeking the construction of a statute (i.e., category (4)). The statutes relevant to that issue are the same statutes that are at issue in determining whether the "legal duty” and "beyond ... authority” "exceptions” (i.e., category (1) and category (6)) are applicable, and, therefore, our resolution of whether those exceptions apply is dispositive.

. In their reply brief, the RSA defendants summarize their position on this matter as follows:
“[The RSA] Defendants have ... made and make investment decisions only to benefit the RSA beneficiaries. Specifically, [the RSA] Defendants follow their policy to include a small fraction of their prudent investments in Alabama, recognizing that ‘a stronger Alabama equates to a stronger Retirement System.' ... Because [the RSA] Defendants make all RSA investments for the exclusive purpose of promoting the interests of RSA beneficiaries, Plaintiffs’ arguments fail.”

. Nor do the internal "Investment Policies and Procedures” adopted by the RSA (“the investment policy”) (or for that matter the RSA's internal mission statement) create a "legal duty” or prohibition that alters this conclusion. Even if the investment policy was in the nature of a formal regulation and, thus, binding on the boards of control, which it is not, the investment policy begins by recognizing a need to maximize "total return” to the ERSA and the TRSA only "within prudent risk parameters.” The investment policy then adds that “the systems recognize that a stronger Alabama equates to a stronger retirement system, and as such, investments in Alabama businesses are encouraged to the extent the investment meets the criteria delineated by this policy statement.” The RSA defendants note that the "criteria delineated by this policy statement” include the statutory requirement that the boards of control act with "care, skill [and] prudence” as stated by the pertinent statutes and reiterated in the preceding paragraph of the investment policy itself. The RSA defendants reject the notion that it was the intent of the investment policy, which the RSA itself promulgated, to expect that investment decisions on the part of the boards of control be for the purpose of maximizing immediate or direct return to the ERSA and the TRSA. " ' [T]he interpretation of an agency regulation by the promulgating agency carries " 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " ' ” Fraternal Order of Police, Lodge No. 64 v. Personnel Bd. of Jefferson Cnty., 103 So.3d 17, 25 (Ala.2012) (quoting Brunson Constr. & Envtl. Servs., Inc. v. City of Prichard, 664 So.2d 885, 890 (Ala. 1995), quoting in turn United States v. Larionoff, 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977), quoting in turn Bowles v. Seminole Rock Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)). A fortiori, the RSA defendants' interpretation and application of the RSA’s own internal policies are entitled to deference.

. Our conclusion in this regard is bolstered by the fact that the type and mixture of investments for which the RSA defendants are now criticized by the plaintiffs have been in place for approximately 15 years with no objection by the legislature. Cf. Tennessee Valley Auth. v. Kinzer, 142 F.2d 833, 837 (6th Cir.1944) (recognizing that, for federal pension plan, "Congress, by regularly appropriating funds ..., has demonstrated its intention that the statutory mandate is to be construed and understood in accordance with the settled construction placed upon it by the Authority [responsible for administering the pension plan], as disclosed by the Rules and Regulations” applicable to the pension plan and that those rules and regulations “are deemed to have received legislative ratification and, thereby, to have become embedded in the law”).